FILED
United States Court of Appeals
Tenth Circuit

July 29, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

LADONNA MULLINS and LINDA
EDWARDS,

        Defendants-Appellants.

No. 09-1031, 09-1091

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 04-cr-463-MSK)**

---

Scott T. Poland, Lakewood, Colorado, for Defendant-Appellant LaDonna Mullins.

Robert T. Fishman, of Ridley, McGreevy & Weisz, PC, Denver, Colorado, for Defendant-Appellant Linda Edwards.

Martha A. Paluch, Assistant United States Attorney (David M. Gaouette, United States Attorney; Patricia W. Davies, Assistant United States Attorney; Matthew T. Kirsch, Assistant United States Attorney, with her on the brief), Denver, Colorado, for Plaintiff-Appellee.

---

Before **MURPHY,** Circuit Judge, **McWILLIAMS,** Senior Circuit Judge, and **GORSUCH**, Circuit Judge.

---

**GORSUCH**, Circuit Judge.

---

LaDonna Mullins and Linda Edwards both owned real estate businesses in the Denver metro area. Both also entered into a scheme to defraud the U.S. Department of Housing and Urban Development ("HUD") by using false information to obtain loans insured by the Federal Housing Administration ("FHA"). For this, Ms. Mullins and Ms. Edwards were indicted for and convicted of wire fraud, among other things. Both now challenge their convictions, and Ms. Edwards her sentence, on multiple grounds, including on the grounds that certain counts were time-barred; that the interstate wires underlying the wire fraud charges weren't reasonably foreseeable; that the government's investigatory methods violated the Sixth Amendment; and that, in sentencing Ms. Edwards, the district court erred in calculating the loss her fraud caused. In the end, however, we discern no reversible error in the district court's proceedings and affirm the judgments against both defendants.

I

Though complex in its detail, the basic thrust of the fraudulent scheme at issue in this case is fairly straightforward. A prospective home buyer would employ either Ms. Mullins or Ms. Edwards as his or her real estate agent. If it turned out the buyer had poor credit that might impede obtaining a mortgage loan, the agent would refer the buyer to Warren Williams or Rod Wesson to "clean up" the buyer's credit so the buyer could qualify for an FHA-insured loan, which is generally easier to obtain than a standard loan. Other times, Mr. Williams or Mr.

Wesson would find prospective buyers and refer them to one of the real estate agents to find a property for them.

Either way, once all the players were in place, Messrs. Williams and Wesson, appropriately known as "document makers," would supply the buyer with false pay stubs, W-2 forms, Social Security numbers, rent verifications, and gift letters to help support the buyer's loan application. To "back up" the documents, Messrs. Williams and Wesson listed one of several fake companies they'd established — including "W&W Enterprises," "Comp. Systems," and "Neighborstat" — as the buyer's employer. The telephone numbers provided for those "employers" rang to the document makers, where Mr. Williams or Mr. Wesson would purport to verify the fraudulent employment information on the documents they'd created.

Once a buyer qualified for an FHA-insured loan and bought a property using false credit information, the document maker and real estate agent on that transaction would divide the spoils. The closing real estate agent would kick back part of her commission to the document maker who prepared the buyer's file, while the document maker would pay the referring agent a cut of the fee he charged the buyer.

Authorities cottoned on to this scheme in 2001, when a HUD review of mortgage companies turned up a suspicious recurrence of the same three companies — W&W Enterprises, Comp. Systems, and Neighborstat — listed as

employers on a number of applications for FHA-insured loans. Further investigation revealed that the documents supporting the loan applications in question contained false information and Social Security numbers that didn't match borrowers' names.

In February 2004, a grand jury issued a 48-count indictment accusing twenty-seven defendants, Ms. Edwards among them, of false statements, the use of false Social Security numbers, and conspiracy. Later, however, the government sought and won the dismissal of its own indictment, for the stated purpose of investigating further suspected criminal conduct by Ms. Edwards and others, and then reindicting them on more comprehensive charges. As part of its investigation, and with the permission of the district court, the government used Mr. Williams, one of Ms. Edwards's erstwhile co-defendants, as an informant. At the government's direction, Mr. Williams initiated and recorded a number of telephone calls and meetings with Ms. Edwards. Those conversations primarily concerned two property sales Ms. Edwards was arranging, and for which she wanted Mr. Williams to prepare false documents. Those transactions, together with other conduct uncovered during the government's investigation as well as the counts alleged in the original indictment, were charged in a superseding indictment brought against Ms. Edwards in February 2005. That indictment also added Ms. Mullins as a defendant.

Eventually, after two further amendments, the currently operative indictment was issued in March 2007. It accused Ms. Mullins of five counts of wire fraud and aiding and abetting. 18 U.S.C. §§ 1343 & 2. Meanwhile, Ms. Edwards, who was involved in significantly more fraudulent loan transactions than Ms. Mullins, was charged with seven counts of wire fraud, six counts of making false statements to HUD, 18 U.S.C. § 1001(a)(3), and two counts of use of a false Social Security number, 42 U.S.C. § 408(a)(7)(B); each count included an aiding and abetting charge.[1] In addition, the indictment called for forfeiture of any proceeds either defendant derived from her crimes.

Ms. Mullins and Ms. Edwards were tried together in a thirteen-day jury trial. In the end, Ms. Mullins was convicted of four counts of wire fraud and acquitted of the fifth. The district court sentenced her to three years' probation and ordered her to pay $66,459.33 in restitution. The court also determined that Ms. Mullins had derived $44,292.00 in proceeds from her fraud and declared that amount subject to forfeiture. Ms. Edwards was acquitted of one count of wire fraud and one count of false statements, but convicted of all other counts against her. The court sentenced Ms. Edwards to forty-one months' imprisonment, ordered her to pay $646,521.87 in restitution, and entered a forfeiture judgment of $139,854.96.

---

[1] Ms. Edwards was also charged with several other counts that were dismissed prior to trial.

Ms. Mullins now appeals her conviction; Ms. Edwards appeals her conviction, sentence, and forfeiture. We address their arguments in turn, beginning with Ms. Mullins.

II

Ms. Mullins offers four arguments on appeal which, she says, warrant the reversal of her convictions. First, she argues that three of the charges on which she was convicted were time-barred because the applicable statute of limitations expired before she was indicted. Second, she contends that her wire fraud convictions cannot stand because there wasn't sufficient evidence for the jury to find that she caused interstate wire transmissions. Third, she urges us to hold that the district court plainly erred in limiting her cross-examination of a government witness regarding the benefits he expected to receive in exchange for his testimony. Fourth, and finally, Ms. Mullins argues that the district court erred in refusing to give her proposed instruction charging the jury that it could find her guilty of a lesser included offense. On examination, we find none availing.

A

Ms. Mullins's first challenge to her conviction concerns the applicable statute of limitations for the wire fraud counts against her. She argues that, for three of the four counts on which she was convicted, the limitations period expired before she was indicted and thus barred her prosecution. We disagree.

1

In general, a five-year statute of limitations applies to non-capital federal crimes. 18 U.S.C. § 3282(a). This default applies to wire fraud charges, but 18 U.S.C. § 3293(2) carves out an important exception: "if the offense affects a financial institution," the government has ten years to indict a defendant before the prosecution becomes time-barred. 18 U.S.C. § 3293(2). The three counts Ms. Mullins challenges as brought outside the statute of limitations involve wire transmissions sent in 1999 but not charged until 2007, as part of the third superseding indictment. Accordingly, the viability of Ms. Mullins's convictions on those counts depends on whether the evidence adduced at her trial supported a finding that those offenses "affect[ed] a financial institution."

First things first: what does it mean to "affect[] a financial institution"? The district court took this statutory language to mean that "the scheme to defraud exposes a financial institution to a new or increased risk of loss or causes the financial institution to suffer an actual loss." Mullins R. Vol. V at 361. Ms. Mullins, meanwhile, would have us read § 3293(2)'s ten-year limitations period to apply *only* when the financial institution suffers an *actual* financial loss attributable to the fraud. We think the district court has the better interpretation. While Congress certainly could have extended the limitations period only when wire fraud "causes a loss" to a financial institution, it chose instead to use the considerably broader term "affects." And that means simply to "make a material

- 7 -

impression on; to act upon, influence, move, touch, or have an effect on," I Oxford English Dictionary 211 (2d ed. 1989), or, perhaps more appositely to this case, "to have a detrimental influence on," Webster's Third New International Dictionary 35 (2002).

As some of our sister circuits have recognized, there may be some point where the "influence" a defendant's wire fraud has on a financial institution becomes so attenuated, so remote, so indirect that it cannot trigger the ten-year limitations period because it does not in any meaningful sense "affect" the institution. *See United States v. Agne*, 214 F.3d 47, 52 (1st Cir. 2000); *United States v. Pelullo*, 964 F.2d 193, 216 (3d Cir. 1992). "[M]ere utilization of a financial institution" as a conduit for funds with no attendant risk of loss to the institution, for example, might not do it. *United States v. Ubakanma*, 215 F.3d 421, 426 (4th Cir. 2000). The district court instructed the jury as much in this case. *See* Mullins R. Vol. V at 361 ("Mere use of a financial institution in a scheme to defraud is not enough to demonstrate that the financial institution was affected by the wire fraud.").

But whatever limits there may be, a "new or increased risk of loss" is plainly a material, detrimental effect on a financial institution, and falls squarely within the proper scope of the statute. The Seventh Circuit has reached this same result, offering the observation that extending the statute of limitations for "putting those institutions at risk, whether or not there is actual harm," ably

- 8 -

serves § 3293(2)'s manifest purpose of "deterring would-be criminals from including financial institutions in their schemes." *United States v. Serpico*, 320 F.3d 691, 694-95 (7th Cir. 2003). Our conclusion also finds support in our circuit's treatment of the federal bank fraud statute, 18 U.S.C. § 1344. In that context, we have held that a potential risk of loss is enough to prove a scheme to defraud a financial institution. *See United States v. Swanson*, 360 F.3d 1155, 1161 (10th Cir. 2004); *United States v. Young*, 952 F.2d 1252, 1257 (10th Cir. 1991). It would be anomalous to say exposing a financial institution to a risk of loss defrauds or "victimize[s]" the institution, *id.*, yet at the same time doesn't "affect" it. The latter term would seem to suggest a lesser standard pertains, and in any event certainly not a greater one.

2

Even if a risk of loss is enough to trigger the ten-year statute of limitations, Ms. Mullins argues her convictions still must be overturned because the government failed to prove even that. In reviewing a challenge to the sufficiency of the evidence such as this, we must view the evidence in the light most favorable to the government and determine whether any reasonable jury could find that Ms. Mullins's fraud exposed a financial institution to a new or increased risk of loss. *See United States v. Rakes*, 510 F.3d 1280, 1284 (10th Cir. 2007). And under that standard, we are constrained to affirm her convictions.

The three counts Ms. Mullins challenges as time-barred involve two lenders, National City Mortgage and FT Mortgage Company. In 1999, when the charged fraud took place, the mortgage companies were wholly owned subsidiaries of National City Bank of Indiana and First Tennessee Bank, respectively. Each of those banks, in turn, was a federally insured financial institution under § 3293(2). The jury heard materially identical testimony from officers for each mortgage company, explaining how fraudulent information on a loan application increases the risk of loss to the lender and its parent bank. Fraudulent information on a loan application — false Social Security numbers, pay records, employment information, and the like — causes the lender to overestimate a borrower's ability to pay off the loan, creating a greater risk of default, foreclosure, and loss to the lender.

This risk persists even after sale of the mortgage to a secondary investor. If the fraud were later discovered, the witnesses explained, the terms of sale allowed the purchaser to force the mortgage company to buy back the loan at full price despite its reduced value. The witness from FT Mortgage explained that in such cases FT Mortgage would incur any loss from a mortgage that subsequently defaults; alternatively, National City Mortgage's representative testified that a lender could resell the loan on the "scratch and dent" market, but for considerably less than face value. Fraud could also preclude the mortgage companies from obtaining FHA insurance on the loans. Or, if the fraud was discovered after FHA

extended coverage, FHA could seek reimbursement from the lender in the event of default. The mortgage companies, as wholly owned subsidiaries, would then pass any loss suffered on to their parent financial institutions.

Assuming, as we must, that the jury credited this testimony, it was sufficient as a matter of law to support the conclusion that, on each of the three counts, Ms. Mullins's fraud exposed a financial institution to an increased risk of loss. The jury was free to conclude that the loans National City Mortgage and FT Mortgage issued based on false information Ms. Mullins helped supply exposed the companies to a greater risk of loss, through the mechanisms the companies' officers described. And the jury could further find that this risk of loss passed through to their parent financial institutions, which would bear any loss the mortgage companies incurred. *See United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998) (holding that a financial institution may be affected for purposes of § 3293(2) by absorbing losses of its wholly owned subsidiary); *Pelullo*, 964 F.2d at 216-17 (same). Accordingly, the ten-year statute of limitations applies and her prosecution on these counts is not time-barred.

Seeking to avoid this result, Ms. Mullins contends there was no realistic prospect of loss to the mortgage companies or the financial institutions because FHA insurance protected them from losses caused by borrower default, and because the fraud was discovered only after the properties were sold and the loans paid off in full. But, as we have already noted, FHA insurance guarantees against

foreclosure, not fraud, and FHA could refuse to insure loans predicated on fraud.

Neither does it matter that the loans in question were paid off before the fraud

was discovered. That does mean, of course, the lenders and their parent banks

didn't suffer an *actual* financial loss from the fraud. But, as we've already

explained, that isn't necessary to trigger the ten-year limitations period. The fact

remains that the jury could find that, by using fraudulent information to obtain

loans, Ms. Mullins and her customers exposed the companies to a greater risk of

loss that persisted at least until extinguished by the final loan payment. That

looming possibility of harm, even if ultimately not realized, was enough to *affect*

the financial institutions for purposes of § 3293(2).

B

We turn next to the sufficiency of the evidence that Ms. Mullins "cause[d]

to be transmitted" interstate wire communications, an essential element of wire

fraud. 18 U.S.C. § 1343. To sustain her convictions, the evidence need not go so

far as to prove she "specifically intend[ed] the use of this or that wire," but it

must at least show that Ms. Mullins did "an act with knowledge that the use of the

wires will follow in the ordinary course of business, or where such use can

reasonably be foreseen, even though not actually intended." *United States v.*

*Wittig*, 575 F.3d 1085, 1099 (10th Cir. 2009) (quoting *Pereira v. United States*,

347 U.S. 1, 8-9 (1954)) (alterations omitted). We review Ms. Mullins's challenge

to the sufficiency of the evidence *de novo*, but in doing so we owe considerable

deference to the jury's verdict. *See Rakes*, 510 F.3d at 1284. We thus view the evidence in the light most favorable to the prosecution and ask if any rational jury could have found beyond a reasonable doubt that use of the interstate wires was a reasonably foreseeable consequence of Ms. Mullins's actions. *See id.* While undoubtedly deferential, this review has some bite: if the evidence does no "more than raise a mere suspicion of guilt" or requires "piling inference upon inference" to conclude the defendant is guilty, we will reverse the conviction. *Id.*

As it happened, the use of interstate wires was integral to Ms. Mullins's and Ms. Edwards's fraudulent scheme. FHA required each loan application to carry an FHA case number, which was used to process and track the application. To obtain the case number, a lender logged in to HUD's FHA Connection computer database system and entered information about the property and prospective borrower. That information was sent to HUD's mainframe in Maryland, which produced and transmitted an FHA case number back to the lender. That case number then appeared on the various loan documents the real estate agents handled through closing of the property purchase. And it was the case number transmissions for each loan application — from Maryland to Colorado — that formed the basis of the wire fraud charges against Ms. Mullins and Ms. Edwards.

It was and is undisputed that those transmissions occurred, that they crossed state lines, and that they were a necessary and integral part of processing

- 13 -

FHA-insured loans. But even spotting the government all that, Ms. Mullins maintains this use of the wires still wasn't reasonably foreseeable to someone in her shoes. On her view, the evidence showed that the process for obtaining the case numbers was so obscure that even an experienced real estate agent like her couldn't have known or foreseen that making fraudulent applications for FHA-insured loans would result in those particular transmissions. Moreover, she maintains that her real estate dealings were entirely Colorado-centric: her office, her property listings, and all the people who helped her process loans were located in the state. Thus, even if the case number wire transmissions might have been foreseeable, Ms. Mullins argues that she nevertheless had no reason to think they would be *interstate* wire transmissions.

Neither of these arguments is persuasive. The wire fraud statute doesn't require that a defendant be able to anticipate every technical detail of a wire transmission, before she may be held liable for causing it. It's enough if she "set forces in motion which foreseeably would involve" use of the wires. *United States v. Roylance*, 690 F.2d 164, 167 (10th Cir. 1982) (quoting *Marvin v. United States*, 279 F.2d 451, 454 (10th Cir. 1960)).[2] That is, we are concerned with whether "the use of the wires . . . in the ordinary course of business," not the

---

[2] While *Roylance* and *Marvin* arose under the mail fraud statute, "interpretations of the mail fraud statute are, of course, authoritative on questions of wire fraud." *Wittig*, 575 F.3d at 1099 n.3 (citing *Pasquantino v. United States*, 544 U.S. 349, 355 n.2 (2005)).

- 14 -

precise use of "this or that wire," was known or reasonably foreseeable to someone in Ms. Mullins's position. *Wittig*, 575 F.3d 1085, 1099 (10th Cir. 2009) (internal quotation marks omitted); *see United States v. Hollis*, 971 F.2d 1441, 1448 (10th Cir. 1992). The evidence at trial showed that Ms. Mullins knew she was dealing with FHA-insured loans, and in fact selected FHA loans even without consulting with her clients. The FHA designation, with case numbers, appeared on closing documents Ms. Mullins saw. Those numbers had to get from FHA to the loan papers somehow, and a rational jury could conclude that using wires to do it was reasonably foreseeable. This is particularly so in light of evidence that wire transmissions are integral to other parts of real estate transactions, such as transferring funds, with which real estate agents are profoundly familiar. Indeed, given the ubiquity of electronic communications in our day and age, one might posit that use of the wires is always foreseeable when conducting such large and complex transactions. *Cf. United States v. Muni*, 668 F.2d 87, 90 (2d Cir. 1981) ("The content of reasonable foreseeability must inevitably keep pace with advances in technology and general awareness of such advances."). For our purposes, though, it's enough to say that, by deliberately choosing FHA-insured loans for her clients, Ms. Mullins could reasonably foresee the case-number wire transmissions that were inexorably to follow. Or, at least, so a jury rationally could find.

We likewise reject Ms. Mullins's contention that, if nothing else, the *interstate* nature of the wire transmissions wasn't foreseeable.[3] She maintains that the real estate transactions underlying her convictions had everything to do with Colorado and only Colorado: all of the people and properties involved were located in the Centennial State. But that's just not so. The charged wire transmissions came from the FHA in Maryland. As its name suggests — and as Ms. Mullins testified she was aware — FHA is an agency of the federal government, whose seat resides outside of Colorado. *See* U.S. Const. art. I, § 8, cl. 17; 4 U.S.C. § 71. From this, it's no stretch for a jury to conclude Ms. Mullins should have anticipated that wire transmissions involving the agency might cross state lines, as they did. Thus, assuming the government had to prove Ms. Mullins

---

[3] As an initial matter, we note that several of our sister circuits have indicated that the government need not prove it was foreseeable a wire communication would cross state lines. Instead, they view the wire's interstate nature as merely a jurisdictional hook for bringing the case into federal court, which doesn't require any degree of *mens rea*. *See United States v. Lindemann*, 85 F.3d 1232, 1241 (7th Cir. 1996); *United States v. Blackmon*, 839 F.2d 900, 907 (2d Cir. 1988); *United States v. Bryant*, 766 F.2d 370, 375 (8th Cir. 1985) (also noting exception when, absent interstate wire transmission, defendant's conduct "would not be a violation of state law and was not itself morally wrongful"); *cf. United States v. Feola*, 420 U.S. 671, 684-86 (1975) (holding statute prohibiting assault on federal officer does not require defendant be aware victim was federal officer). Our court, meanwhile, doesn't appear to have ruled definitively on this question. *But cf. Roylance*, 690 F.2d at 167 ("One causes mailings and triggers operation of 18 U.S.C. § 1341 when it is reasonably foreseeable his . . . activities will result in the use of interstate mails."). And we need not do so today; even assuming without deciding that a foreseeability requirement extends to the interstate nature of wire communications, it is satisfied here.

- 16 -

could reasonably foresee the *interstate* nature of the transmissions charged, a reasonable jury could find it did so here.

C

Next, Ms. Mullins argues the district court violated her confrontation rights and denied her a fair trial when it limited her cross-examination of a key government witness, Roderick Wesson. Mr. Wesson was, of course, one of the document makers at the center of the fraudulent loan scheme, as well as one of the first defendants to cooperate with the government's investigation. Seeking to challenge his credibility, on cross-examination Ms. Mullins's attorney asked Mr. Wesson whether, as part of his deal with the government, he didn't have to pay taxes on his income from the scheme. The court overruled a government objection on relevancy grounds, and Mr. Wesson answered: "I wasn't asked to pay any taxes. They told me I didn't have any taxes to pay." Mullins R. Vol. IV at 1102. Pressing further, defense counsel asked Mr. Wesson whether any criminal tax evasion charges had been brought against him. Again the government objected. This time the court sustained the objection. The court acknowledged that "this witness' understanding of his agreement with the Government is . . . pertinent to credibility [and] to what his motivation is for his testimony." *Id.* at 1124. But, the court continued, "[w]hether he has been charged with tax evasion seems to me to be redundant and cumulative of that which you have already elicited, which is that he has a deal with the Government

- 17 -

where he doesn't have to pay any taxes." *Id.* Ms. Mullins's attorney replied, "Fair enough, Judge," and moved on with his cross-examination. *Id.*

Ms. Mullins now argues this limitation violated her Confrontation Clause and due process rights to cross-examine Mr. Wesson. Because Ms. Mullins made no objection at trial — on confrontation, due process, or other grounds — to the district court's decision, we will reverse only if it was "plain error for the district court to fail to raise the constitutional issue *sua sponte*." *United States v. Perez*, 989 F.2d 1574, 1582 (10th Cir. 1993) (en banc). That is, Ms. Mullins must show the district court committed (1) error (2) that is clear or obvious under current law, and which both (3) affected her substantial rights and (4) undermined the fairness, integrity, or public reputation of judicial proceedings. *See United States v. Hutchinson*, 573 F.3d 1011, 1019 (10th Cir. 2009); *Perez*, 989 F.2d at 1583.

Ms. Mullins's argument fails on the first step, because there was here no error at all.[4] Mr. Wesson's deal with the government was undoubtedly fair game

---

[4] There may be some tension within our circuit's precedents as to the proper standard of review for confrontation claims premised on cross-examination restrictions. *Compare United States v. Byrne*, 171 F.3d 1231, 1234 (10th Cir. 1999) (reviewing this question *de novo*), *with United States v. Hinkle*, 37 F.3d 576, 579 (10th Cir. 1994) (reviewing this question for abuse of discretion). *But see United States v. Hargrove*, 2010 WL 2399348, at *6 (10th Cir. 2010) (unpublished) ("We review rulings regarding limitations on cross-examination . . . for abuse of discretion. Whether a violation of the Confrontation Clause arose from evidentiary rulings is a question we review de novo." (citations omitted)). Because we perceive no error even under the more generous (to Ms. Mullins) *de novo* standard, we apply that standard here, but leave the task of reconciling whatever conflict there may be in our precedents for a case where the
(continued...)

for cross-examination. It shed light on what he stood to gain from testifying against Ms. Mullins, and that motivation in turn directly implicated his credibility. *See Davis v. Alaska*, 415 U.S. 308, 316 (1974). But the right to cross-examine witnesses isn't absolute. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, . . . interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *see also United States v. Durham*, 139 F.3d 1325, 1334 (10th Cir. 1998). The touchstone for whether the Confrontation Clause has been satisfied is "whether the jury had sufficient information to make a discriminating appraisal of the witness' motives and bias." *United States v. Gault*, 141 F.3d 1399, 1403 (10th Cir. 1998) (internal quotation marks omitted). The jury had before it sufficient evidence to do just this.

It did because Ms. Mullins was allowed extensive cross-examination into Mr. Wesson's cooperation agreement with the government. That cross-examination revealed, among other things, that Mr. Wesson was sentenced to just fourteen months' prison time for his involvement in the mortgage scheme, was paying off his $142,000 restitution order at a rate of $25 per month (with a number of missed payments), and believed he didn't have to pay taxes on his ill-

_____

[4](...continued)
standard of review might affect the outcome. *See Hydro Res., Inc. v. EPA*, ___ F.3d ___, 2010 WL 2376163, at *12 n.10 (10th Cir. 2010) (en banc).

gotten gains. The *only* restriction the court imposed on this inquiry was to bar a

single question about possible tax evasion charges against Mr. Wesson, which the

court believed cumulative after counsel had elicited Mr. Wesson's understanding

that he didn't have to pay any taxes. We think this limit was reasonable and

safely within the "wide latitude" the Confrontation Clause affords the district

court. It didn't cut off all questioning on an important area of cross-examination,

and it left the jury with substantial information about Mr. Wesson's leniency from

the government. We do not think the "jury might have received a significantly

different impression" of his credibility had the challenged question been allowed.

*Van Arsdall*, 475 U.S. at 680.[5]

### D

Finally, Ms. Mullins argues that the jury should have been instructed that it

could, in lieu of finding her guilty of wire fraud, convict her of the lesser

---

[5] Ms. Mullins also frames the limitation on her cross-examination as a violation of her due process right to a fair trial. She refers to the government's obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose exculpatory evidence, including material that might be used to impeach government witnesses, and from that infers a right to cross-examine witnesses on such matters. *Brady*'s disclosure requirements and the right to cross-examination are, of course, integrally connected. *See Nuckols v. Gibson*, 233 F.3d 1261, 1267 (10th Cir. 2000). In the absence of any allegation that the government failed to disclose evidence, however, we think our Confrontation Clause precedent provides the proper rubric for assessing her claim. *Cf. United States v. Atwell*, 766 F.2d 416, 421 (10th Cir. 1985). In any event, having concluded that her confrontation rights weren't violated, we are satisfied that Ms. Mullins wasn't deprived of a fair trial.

- 20 -

included offense of making a false statement to HUD, a violation of 18 U.S.C. § 1012. The district court rejected this argument, and so must we.

A defendant is entitled to a lesser included offense instruction if "(1) there was a proper request; (2) the lesser included offense includes some but not all of the elements of the offense charged; (3) the elements differentiating the two offenses are in dispute; and (4) a jury could rationally convict the defendant of the lesser offense and acquit him of the greater offense." *United States v. McGuire*, 200 F.3d 668, 673 (10th Cir. 1999) (quoting *United States v. Moore*, 108 F.3d 270, 272 (10th Cir. 1997)). We exercise plenary review of the second question — whether an offense is actually a lesser included offense of the charged offense — while we review a district court's determination as to whether the evidence justifies a lesser included offense instruction for abuse of discretion. *Id.*

There's no dispute Ms. Mullins satisfied the first requirement by proffering a lesser included offense instruction to the district court. But her claim to the instruction runs aground at the second step, where we ask whether the elements of the requested lesser offense are a "subset of the elements of the charged offense." *Schmuck v. United States*, 489 U.S. 705, 716 (1989). If making a false statement to HUD requires proof of some element different from or in addition to those wire fraud requires, it isn't properly considered a lesser included offense. *See McGuire*, 200 F.3d at 674. And to list the elements of both crimes is to answer the question. The elements of wire fraud are "(1) a scheme to defraud; (2) an

interstate wire communication; and (3) a purpose to use the wire communication to execute the scheme." *Wittig*, 575 F.3d at 1093 (internal quotation marks omitted). Making a false statement to HUD, meanwhile, requires proof of (1) a false report or statement (2) to or for the Department of Housing and Urban Development (3) with intent to defraud. 18 U.S.C. § 1012. Whatever other distinctions one might draw between the elements of these offenses, it's indisputable that making a false statement to HUD includes an element — that the statement be to or for HUD — that wire fraud doesn't. Thus, it isn't included within the charged offense and Ms. Mullins wasn't entitled to the requested instruction.[6]

Ms. Mullins appears to argue that making a false statement to HUD is a lesser included offense of wire fraud in *this* case because the alleged fraud included statements to HUD. It may well be that the same *evidence* used here to convict Ms. Mullins of wire fraud could have also supported a charge of making false statements to HUD. But the Supreme Court has rejected just such an approach to lesser included offense instructions. *See Schmuck*, 489 U.S. at 715-21. We are only to compare the *statutory elements* of the two offenses, not ask whether the *evidence* offered to prove the greater offense also establishes the

---

[6] Ms. Mullins argued for 18 U.S.C. § 1012 as the lesser included offense before the district court, *see* Mullins R. Vol. V at 311-13; before us she seems to stake her claim on 18 U.S.C. § 1010. But that provision, too, requires at least one element — intent to obtain a HUD-insured loan — that wire fraud does not.

lesser.  *See id.*  And, as we've explained, Ms. Mullins's argument fails under that, the proper test.

## III

We turn now to Ms. Edwards's appeal.  She raises essentially five challenges to her convictions and sentence.  First, she argues that the government violated her Sixth Amendment right to counsel as well as her right to due process when it contacted her, through its informant, during the period when no indictment was pending against her.  Second, she alleges that the district court gave the jury a defective instruction with respect to aiding and abetting.  Third, and like Ms. Mullins, she contends that there was insufficient evidence to prove she could reasonably have foreseen the interstate wire communications underlying her wire fraud convictions.  Fourth, she alleges various errors in how the district court calculated the loss caused by her fraud for sentencing and restitution purposes.  Fifth, and finally, she asks us to reverse the district court's criminal forfeiture order, on the ground that the court improperly shifted the burden of proof from the government onto her.  Considering these objections in turn, we conclude none presents reversible error.

## A

Ms. Edwards first challenges the government's actions in dismissing the initial indictment against her (while stating its intent later to reindict on greater charges), then using Mr. Williams to question her outside the presence of her

attorney, and then reindicting her. She contends she had a Sixth Amendment right to counsel during the period when no indictment was pending against her, and that the government's actions violated that right. The government, for its part, maintains the Sixth Amendment right to counsel applies only to *currently pending* charges, and so had no effect at all, and couldn't've been violated, during the temporary indictment intermezzo. We conclude Ms. Edwards's claim must fail, though in doing so we need not adopt today the rule the government urges. Even assuming without deciding that Ms. Edwards did retain a Sixth Amendment right to counsel between indictments, it didn't attach to any charges for which she was ultimately convicted. Accordingly, no Sixth Amendment violation could have infected the criminal judgment rendered against her.

The Sixth Amendment forbids the government from eliciting incriminating statements from a defendant outside the presence of counsel. *See Maine v. Moulton*, 474 U.S. 159, 176 (1985). But, the Supreme Court has instructed, this protection is "offense specific." *Texas v. Cobb*, 532 U.S. 162, 164 (2001). It "attaches only to charged offenses" — that is, offenses for which "adversary judicial criminal proceedings" have begun, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* at 167-68, 172 (2001) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). Accordingly, the government remains free to seek uncounseled statements from a defendant

about *uncharged* offenses without offending the Sixth Amendment.[7] That said, the scope of the Sixth Amendment right is not completely defined by "the four corners of a charging instrument": its bar against the government seeking incriminating statements from the defendant "encompass[es] offenses that, even if not formally charged, would be considered the same offense under the *Blockburger* [*v. United States*, 284 U.S. 299 (1932)] test." *Id.* at 173. Apart from this narrow exception, however, there is no Sixth Amendment right to counsel for uncharged offenses, even if they are "closely related to" or "inextricably intertwined with" charged offenses. *Id.* (quoting *id.* at 186 (Breyer, J., dissenting)).

So it is that, even assuming without deciding that Ms. Edwards enjoyed a Sixth Amendment right to counsel between indictments, the right pertained only to the offenses charged in the original indictment (or those that would be considered the same offense under the *Blockburger* test). With respect to other offenses that appeared only in later, superseding indictments, the criminal adversary process simply hadn't begun; the Sixth Amendment hadn't been triggered. And, as it happened, it was only on those *latter* offenses that Ms. Edwards was convicted. She thus can't establish a Sixth Amendment violation

___

[7] The Fifth Amendment, of course, affords a right to counsel during *custodial* questioning, even before the start of adversary proceedings. *Cobb*, 532 U.S. at 171 & n.2 (citing *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). Ms. Edwards makes no claim that her conversations with Mr. Williams were custodial, or that her *Miranda* rights were in any way violated.

that might undermine the validity of any of those convictions and give us grounds to reverse them.

This conclusion flows ineluctably from a comparison of the original indictment and Ms. Edwards's ultimate counts of conviction.[8]  As we've noted, the Sixth Amendment attaches both to formally charged offenses and to any crime that would be considered the same offense as a charged offense under *Blockburger*.  *Cobb*, 532 U.S. at 173.  We thus ask whether each of the charges in the original indictment and each of the counts of conviction "requires proof of a fact which the other does not."  *Blockburger*, 284 U.S. at 304; *see also id.* (applying this test "where *the same act or transaction* constitutes a violation of two distinct statutory provisions" (emphasis added)).  If so, they are separate offenses, and the Sixth Amendment poses no obstacle to Ms. Edwards's convictions.  No violation occurred with respect to Ms. Edwards's wire fraud convictions under 18 U.S.C. § 1343 because the original indictment didn't charge *any* counts of wire fraud.  The closest charge was a count under 18 U.S.C. § 371 alleging conspiracy to commit offenses against the United States, specifically

_____

[8]  Ms. Edwards was charged in Counts 1 (conspiracy), 2-4, 11-14, 25 (false statements within the jurisdiction of the executive branch), 26-27, 34-37, and 46 (false use of a Social Security number) of the original indictment.  *See* Indictment in *United States v. Wesson*, 04-cr-70 (D. Colo. 2004), Edwards R. Suppl. Vol. II ("Original Indictment").  She was ultimately convicted on Counts 6, 8, 10, 15-17 (wire fraud), 19-21, 23, 26 (false statements to HUD), and 31-32 (false use of Social Security number) of the third superseding indictment.  *See* Third Superseding Indictment, Edwards R. Vol. II at 657; Judgment in a Criminal Case, Edwards R. Vol. II at 1506 (listing counts of conviction).

violations of 18 U.S.C. §§ 1001 and 1010 and 42 U.S.C. § 408(a)(7)(B). It is well settled "that a substantive crime and a conspiracy to commit that crime are not the 'same offence'" under *Blockburger.* *United States v. Felix*, 503 U.S. 378, 389 (1992).[9] And so it goes without saying that a substantive crime and a conspiracy to commit *different* crimes are likewise distinct under that test.

Ms. Edwards's other convictions were for false statements to HUD, 18 U.S.C. § 1001(a)(3), and the false use of a Social Security number, 42 U.S.C. § 408(a)(7)(B). Unlike wire fraud, alleged violations of these provisions did appear in both the original indictment and the final judgment of conviction. But the conduct underlying Ms. Edwards's convictions was completely different from that alleged in the original indictment: each count of conviction involved clients, properties, loan applications, and Social Security numbers that appear nowhere in the original indictment. *Compare* Original Indictment, Edwards R. Suppl. Vol. II (counts 1-4, 11-14, 25-27, 34-37), *with* Third Superseding Indictment, Edwards R. Vol. II at 657 (counts 19-21, 23, 26, 31-32); *see Robbins v. United States*, 476 F.2d 26, 32 (10th Cir. 1973) (holding that, to be the same offense, two counts "must be identical in law and fact"); *United States v. Sasser*, 974 F.2d 1544, 1549 (10th Cir. 1992) (holding two charges distinct under *Blockburger* because second

_____

[9] That said, there are cases in the double jeopardy context where an acquittal for conspiracy will, as a practical matter, collaterally estop the government from proving the underlying substantive crime. *See Wittig*, 575 F.3d at 1100-01. That obviously isn't the case here.

- 27 -

charge "involved different events and entirely different facts" than first).  Ms. Edwards thus can't establish any Sixth Amendment right to counsel, or violation, with respect to any of her counts of conviction.

Seeking to avoid this result, Ms. Edwards quotes our statement in *United States v. Mitcheltree*, 940 F.2d 1329, 1342 (10th Cir. 1991), that "[t]he government may violate a defendant's sixth amendment right to counsel when it deliberately elicits uncounseled statements about very closely related crimes which arise out of the same course of conduct as the charged offenses," as well as authority from other jurisdictions holding that "the government may not evade the Sixth Amendment simply by dismissing the initial indictment and reindicting the defendant on charges stemming from the same investigation," *United States v. Marshank*, 777 F. Supp. 1507, 1526 (N.D. Cal. 1991); *see also United States v. Valencia*, 541 F.2d 618, 622 (6th Cir. 1976) (holding that right to counsel continued after dismissal of indictment when defendant was reindicted on charges that "gr[e]w out of the same dealings" as the initial charges).  She argues that, because the initial indictment, the conversations with Mr. Williams, and the superseding indictments "all revolved around allegations of fraud in connection with the application for FHA-insured home mortgages," once the initial indictment was filed a Sixth Amendment right to counsel attached to *all* possible charges connected to that fraud.  Edwards Opening Br. at 16-17; *see also* Edwards Reply Br. at 3.

The problem with this line of argument, however, is that the cases on which Ms. Edwards relies all antedate *Cobb*, which explicitly rejected this interpretation of the Sixth Amendment. *See Cobb*, 532 U.S. at 168-74 & n.1. As we've already noted, *Cobb* focuses the Sixth Amendment right on offenses, not on transactions, occurrences, or "crimes that are 'factually related' to a charged offense." *Id.* at 168.

A comparison to the facts of *Cobb* confirms the point and its applicability to Ms. Edwards. In *Cobb*, the defendant had been indicted for burglary when police questioned him about the disappearance of two persons from the scene of the burglary. The defendant eventually confessed that he had murdered them both as he was burglarizing their home; the confession was admitted against him at the ensuing murder trial. *Id.* at 165-66. Undoubtedly the burglary and murder charges were factually related and "ar[o]se out of the same course of conduct." *Mitcheltree*, 940 F.2d at 1342. But the defendant's indictment for burglary didn't trigger his Sixth Amendment rights on the murder charges, because each offense required proof of some element the other did not. *Cobb*, 532 U.S. at 174. The same result must follow in the case before us. Even if we could be certain all of the charges against Ms. Edwards arose from the same course of conduct — a shakier proposition than in *Cobb*, which involved only one criminal transaction, not many — the disparate proof required for the original counts and the counts of conviction would still preclude an extension of the Sixth Amendment aegis from

- 29 -

the former to the latter charges.  And that conclusion requires us to affirm Ms. Edwards's convictions.

To this, Ms. Edwards replies that the government's behavior not only violated her Sixth Amendment rights but also amounted to "outrageous government conduct" such that the Fifth Amendment's due process guarantee compels the dismissal of the charges against her.  *United States v. Scull*, 321 F.3d 1270, 1277 (10th Cir. 2003).  But, to the extent that her outrageous government conduct claim is premised on the alleged circumvention of her Sixth Amendment right to counsel (rather than some independent misconduct), it follows that she has failed to demonstrate any impermissibly "shocking" or "intolerable" government behavior that might warrant reversal of her convictions on due process grounds.  *Id.* (internal quotation marks omitted).

Recognizing this possibility, Ms. Edwards submits that the government's conduct was outrageous and in violation of the Fifth Amendment's due process guarantee for the independent reason that it violated Colorado Rule of Professional Conduct 4.2.  At the relevant time, Rule 4.2 provided that "[i]n representing a client a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."  Colo. R. Prof'l Conduct 4.2 (1993).

As an initial matter, though, it's unclear whether or when a violation of an ethics rule should produce an error of *constitutional* proportion. *Cf. Montejo v. Louisiana*, 129 S. Ct. 2079, 2087 (2009) ("[Defendant's] rule appears to have its theoretical roots in codes of legal ethics, not the Sixth Amendment."); *Strickland v. Washington*, 466 U.S. 668, 688 (1984) ("Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable [assistance of counsel], but they are only guides."); *United States v. Thomas*, 474 F.2d 110, 112 (10th Cir. 1973) ("A violation of the canon of ethics as here concerned need not be remedied by a reversal of the case wherein it is violated. This does not necessarily present a constitutional question, but this is an ethical and administrative one relating to attorneys practicing before the United States courts.").

But we need not enter that thicket because no ethical violation that might warrant remedy occurred here in the first place. This is so for at least two independent reasons. First, as we have held in interpreting its predecessor, Rule 4.2 applies, like the Sixth Amendment, only once adversary criminal proceedings have commenced. *See United States v. Ryans*, 903 F.2d 731, 737-40 (10th Cir. 1990) (interpreting Code of Professional Responsibility Disciplinary Rule 7-104(A)(1)); *see also United States v. Ford*, 176 F.3d 376, 382 (6th Cir. 1999) ("Since prosecutors were investigating an offense other than the offense for which Defendant was indicted, the contact does not pertain to the 'subject matter of the

representation' as Rule 4.2 states."). And, as we've explained, at the time Mr.

Williams contacted Ms. Edwards, such proceedings hadn't begun with respect to

her ultimate counts of conviction. Second, the district court found that

government attorneys did not violate Rule 4.2 because they did not *know* Ms.

Edwards was represented by counsel at the time of Mr. Williams's contact with

her. *See* Colo. R. Prof'l Conduct, Terminology ("'[K]nows' denotes actual

knowledge of the fact in question . . . .") (1993). We cannot say the court's

factual finding on this score was clearly erroneous, and it is undisputed that no

violation of Rule 4.2 could occur without such knowledge. *Cf. Thomas*, 474 F.2d

at 112 (discussing predecessor to the Rules of Professional Conduct without

reference to knowledge requirement).[10]

## B

Ms. Edwards next alleges the district court erred in failing to instruct the

jury that, to find her guilty of aiding and abetting wire fraud, it had to agree

unanimously which individual or individuals she aided and abetted. Because Ms.

Edwards didn't object to the court's instructions at trial on this basis, we are

constrained to review her argument on appeal only for plain error. *See*

---

[10] The district court also seemed to hold that the government was "authorized by law" to act as it did because it received the district court's advance permission before contacting Ms. Edwards through its informant at a time when the court believed she lacked counsel. *See* Colo. R. Prof'l Conduct 4.2 (1993) (allowing contacts with unrepresented persons when "authorized by law"). Given that we think its conclusion affirmable for two separate reasons already, we have no need to pass on this additional rationale.

*Hutchinson*, 573 F.3d at 1019; Section II.C, *supra* (describing four-part plain error test). But here again we find no error at all.

Under the Sixth Amendment, a jury must agree unanimously on all essential elements of a crime before the state may impose criminal penalties on a defendant. *United States v. Powell*, 226 F.3d 1181, 1196 (10th Cir. 2000). There's no dispute that the district court adequately instructed the jury in this respect. It said:

> An indictment may accuse a defendant of violating a statute in more than one way or with more than one other person. In such event, it is not necessary that the Government prove that the defendant used all of the means or methods that are described or that the defendant acted together with all of the persons identified. However, the Government must prove beyond a reasonable doubt that the defendant used at least one of the means or methods that are described. In order for you to return a guilty verdict, all 12 of you must agree that the same act has been proven.

Edwards R. Vol. III at 2055.

Ms. Edwards contends, however, that the district court should have gone further and instructed the jury that, in addition to agreeing as to the particular *act* she committed to aid and abet wire fraud, it must also come to a unanimous conclusion as to the particular *person* whose fraud she aided and abetted. Our longstanding precedent instructs us otherwise. More than three decades ago, this court held that "[p]roving beyond a reasonable doubt that a specific person is the principal is not an element of the crime of aiding and abetting. It is not even essential that the identity of the principal be established. The prosecution only

need prove that the offense has been committed." *United States v. Harper*, 579 F.2d 1235, 1239 (10th Cir. 1978). As the government didn't have to prove who Ms. Edwards aided and abetted, it follows that the jury didn't have to agree unanimously on that person's identity.

The rationale for this rule is obvious. Imagine, for example, that a defendant hands a masked person a candlestick and cheers on as that person uses it to bludgeon to death one Mr. Boddy. Afterward, the defendant is immediately apprehended, but the assailant disappears without a trace. The clues as to the assailant's identity are ambiguous — it's equally likely that Mr. Green, Miss Scarlet, Professor Plum, Mrs. White, Colonel Mustard, or Mrs. Peacock is the murderer. In such a situation, it might be impossible for a jury to agree, unanimously and beyond a reasonable doubt, who directly committed the crime. But it is beyond peradventure that the defendant aided and abetted Mr. Boddy's murder and is equally culpable, whoever wielded the candlestick. So, too, here. Whether or not it's proven precisely whose wire fraud Ms. Edwards's actions aided and abetted, that has no bearing on whether she committed a crime herself. It's enough that *someone* committed wire fraud, and that Ms. Edwards sought to make it succeed. The district court didn't err in refusing to instruct the jury otherwise.

C

Like Ms. Mullins, Ms. Edwards attacks the sufficiency of the evidence establishing that interstate wire transmissions were reasonably foreseeable. *See supra* Section II.B. And, as with Ms. Mullins's challenge, we are obliged to sustain Ms. Edwards's convictions. Evidence at trial showed that Ms. Edwards deliberately chose FHA-insured loans for her clients and that FHA case numbers appeared on closing documents she saw. As we've already described in affirming Ms. Mullins's convictions, it was reasonably foreseeable that those numbers would be the product of interstate wire transmissions.

If anything, the evidence showing Ms. Edwards reasonably foresaw the use of interstate wire transmissions was even stronger than it was for Ms. Mullins. Warren Williams testified that Ms. Edwards explained to him the procedure by which a loan officer or processor had to obtain an FHA case number before a transaction could be completed. The jury also heard from Nina Cameron, a former loan officer and erstwhile friend of Ms. Edwards who worked with her on many real estate transactions, including at least fifteen involving false credit documents. Ms. Cameron was well familiar with the computerized process for obtaining FHA case numbers and described how a loan processor must go through the FHA website to receive them. Viewing this evidence in the light most favorable to the government, the jury reasonably could have inferred that Ms.

Edwards, too, knew that getting the case numbers involved interstate wire transmissions, or at least reasonably foresaw that possibility.

D

Ms. Edwards attacks her sentence on two grounds, both related to how the district court calculated the financial loss attributable to her fraud. To quantify that loss, the court took the outstanding balances due on sixteen defaulted loans Ms. Edwards assisted in procuring and subtracted from each the foreclosure sale price when HUD liquidated the mortgaged property. In other words, the court compared what was owed on the loans to what was actually received. In the end the court determined that Ms. Edwards's fraud had caused a $460,113.98 loss, and so increased her base offense level by 14 levels, as directed by the applicable Sentencing Guidelines. *See* U.S.S.G. § 2B1.1(b)(1)(H) (2002) (directing 14-level enhancement if fraud causes loss between $400,000 and $1 million).[11] Ms.

[11] A few housekeeping details: First, although Ms. Edwards argued in the district court that either the 2000 or the 2001 Sentencing Guidelines should apply to her case, on appeal she raises no quarrel with the district court's decision to use the 2002 version. Second, we note that the district court did not announce a precise loss figure but rather simply stated that the amount exceeded $400,000. As Ms. Edwards and the government agree, however, it's clear from the exhibits on which the court relied that the actual loss amount was $460,113.98. Third, the government's initial loss estimate included a number of expenses and fees it said were associated with the management and sale of the foreclosed properties. The government removed these charges after a defense objection, and they are no longer at issue in this case. Fourth, the district court calculated Ms. Edwards's restitution amount by the same method, ordering her to pay $646,521.87. This amount exceeds the loss figure because, under the Sentencing Guidelines, interest (here, interest due on the fraudulent mortgage loans) may not be considered in

(continued...)

Edwards registers no objection to this general method of calculating loss, but does levy two attacks against its application in her case. First, she argues that HUD irrationally sold many of the foreclosed properties for well below their actual values, thus unreasonably and unforeseeably inflating the loss charged to her. Second, she maintains that the district court erroneously included in its loss calculations one loan that was refinanced prior to foreclosure, even though it excluded two other refinanced loans. Were we to correct these alleged errors, she says, her loss total would fall below $400,000 — the threshold for a 14-level enhancement — and thus require re-sentencing.

1

When a defendant challenges the procedural reasonableness of her sentence by attacking the district court's loss calculation, our task is to determine whether the district court's factual finding of loss caused by the defendant's fraud is clearly erroneous. *See United States v. Sutton*, 520 F.3d 1259, 1262 (10th Cir. 2008). That is, we may disturb the district court's loss determination — and consequent Guidelines enhancement — "only if the court's finding is without factual support in the record or if, after reviewing all the evidence, we are left

[11](...continued)
calculating loss for increasing a defendant's base offense level, *see* U.S.S.G. § 2B1.1, cmt. n.2(D), but may be included in a restitution order. Apart from this distinction (whose application she doesn't contest), Ms. Edwards suggests no way in which the loss calculation for sentencing and the restitution calculation should have been conducted differently from each other. We therefore consider both together.

with a definite and firm conviction that a mistake has been made." *Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258, 1263 (10th Cir. 2008) (internal quotation marks omitted).  To be clearly erroneous, "a finding must be more than possibly or even probably wrong; the error must be pellucid to any objective observer." *Watson v. United States*, 485 F.3d 1100, 1108 (10th Cir. 2007).  In conducting our inquiry, we are mindful that the district court "need only make a reasonable estimate of the loss," not make a perfect accounting.  U.S.S.G. § 2B1.1(b)(1), cmt. n.2(C).  Accordingly, we owe the sentencing judge "appropriate deference," in recognition of her "unique position to assess the evidence and estimate the loss based upon that evidence." *Id.*

Before us, Ms. Edwards doesn't dispute that subtracting a property's sale price from the remaining loan balance is an appropriate metric for measuring loss.  Rather, she insists that the proceeds HUD took in from liquidation sales — though technically reflective of the loss caused by her fraud — were unreasonably low and thus don't reflect the "reasonably foreseeable pecuniary harm" attributable to her fraud for purposes of the Sentencing Guidelines.  U.S.S.G. § 2B1.1(b)(1), cmt. n.2(A)(i).  By way of example, she points to two sets of appraisals conducted on the properties:  the first conducted when Ms. Edwards's clients purchased them, the second a year or two later, in apparent preparation for HUD's liquidation sale of the properties after borrowers defaulted on their loans.  She faults the later appraisals for assigning significantly lower values to the

properties — as much as 40% less — than did the first appraisals only a short time before, even while home values in the Denver metro area were allegedly rising. Because HUD's liquidation sales of the properties were based on these dramatically lower appraisals, she contends the agency's receipts from those sales were also unreasonably low. The result, she says, was to inflate the district court's loss calculation beyond what she reasonably could have foreseen when she committed her fraud. What's worse, she adds, is that HUD sold the properties erratically: some at their appraised values, others above their appraised values, and — most significantly to her — others well below their appraised values. Ms. Edwards argues that she couldn't have foreseen this "utterly inconsistent and seemingly irrational" disposition of the properties and so shouldn't be saddled with the below-appraisal losses it produced. Edwards Opening Br. at 31.

The district court rejected Ms. Edwards's argument.[12] As the court recognized and Ms. Edwards doesn't dispute, the (or at least an) appropriate measure of loss here is the difference between the amount owed on the defaulted loans Ms. Edwards facilitated and the amount HUD recovered in liquidating the

[12] Ms. Edwards made these same arguments, as well as others no longer at issue, to the district court. The court found some of her objections meritorious but rejected others (including, of course, those she now presses). The government contends that, because Ms. Edwards failed to renew her objections when the district court announced its revised loss calculation, we should review that figure only for plain error. Ms. Edwards maintains her previous objections were enough to preserve her arguments. We don't have to resolve this dispute, however, because we hold the district court didn't err even under the less stringent standard of review Ms. Edwards wishes us to apply.

properties. Those actual amounts aren't in dispute. The appraisals, be they high or low, are relevant only insofar as they indicate the sale proceeds were reasonable (and thus foreseeable). The district court carefully considered the alleged problems with the appraisals in this light. Indeed, it lamented the paucity of information about how HUD conducted its appraisals and why the figures they produced were lower than the first set of appraisals. But it also noted that neither did it have any such information about the original appraisals. In short, the court "kn[e]w nothing about the appraisals" other than that the later, lower valuations were "more contemporaneous to the ultimate sale after foreclosure." Edwards R. Vol. V at 2807. Based on this fact, as well as the commonsense observation that properties in foreclosure may well fall into disrepair and decline in value even in a rising market, the district court deferred to the second set of appraisals. The court thus credited HUD's sale prices as the appropriate subtrahend in its loss calculation and, from that, found Ms. Edwards was responsible for more than $400,000 worth of loss.

We are in no position to upset this conclusion, or the corresponding 14-level increase it triggered. The simple fact is, whatever questions the appraisals might raise, their significance isn't so clear-cut as to compel the conclusion that the sale figures — the actual basis for the loss calculation Ms. Edwards seeks to undo — couldn't have been foreseen. As the district court noted, the declining appraisal values could have reflected the disrepair suffered by properties subject

to foreclosure. Neither, we might add, do the allegedly erratic sale prices Ms. Edwards attacks command the inference that HUD was irrational in its liquidation practices. Even assuming without deciding that sale prices substantially and uniformly below contemporaneous appraisal values might have suggested as much, that's not what happened here. Properties also sold at and above their appraised values. That might instead suggest the agency was simply a motivated seller confronted with the vagaries of an ever-changing marketplace, which surely was foreseeable. At a minimum, this possibility means we can't say the district court's finding — that HUD's sale prices reflected the reasonably foreseeable pecuniary harm caused by Ms. Edwards's fraud — was pellucidly in error.

2

Ms. Edwards's second attack on her sentence again involves the district court's loss calculation. The government initially included in its proposed loss calculation several properties with refinanced mortgage loans. This meant the initial loans, which Ms. Edwards facilitated, had been paid off before the borrowers defaulted on their new loans, which Ms. Edwards wasn't involved in obtaining. Upon Ms. Edwards's objection, the district court excluded from its final loss calculation two refinanced properties, transactions "1K" and "1T." The court observed that, while Ms. Edwards's fraud may still have been a contributing cause of the later defaults in some way, the intervening refinancing meant she was no longer the proximate cause of any loss. Understanding itself to have discretion

whether or not to consider such losses in sentencing, the district court chose to remove those two properties from its final loss calculation.

As it turns out, however, one more refinanced property — transaction "1U" — was still included in the loss calculation. Ms. Edwards now says that apparent oversight was in error. And, because subtracting the $61,478.13 loss from transaction 1U would bring the total loss calculation below the $400,000 threshold for a 14-level enhancement, she says we must remand her case for re-sentencing to correct the error.

It's unclear from the record before us why the district court didn't exclude transaction 1U from its loss calculation. But it is clear that the fault for the oversight must lie with Ms. Edwards. She didn't object to 1U's inclusion before the district court and so didn't give the court a fair opportunity to correct the error (if error it was). *See United States v. Uscanga-Mora*, 562 F.3d 1289, 1294 (10th Cir. 2009). Accordingly, we may disturb the district court's judgment only if Ms. Edwards demonstrates plain error. *See Hutchinson*, 573 F.3d at 1019; Section II.C, *supra* (describing four-part plain error test).

She hasn't carried that burden. Even assuming *dubitante* that including 1U's refinanced loan in the loss calculation was obviously erroneous under settled law, Ms. Edwards hasn't satisfied the final two prongs of plain-error review — namely, showing that the error affected her substantial rights and undermined the fairness, integrity, or public reputation of judicial proceedings. *See Hutchinson*,

- 42 -

573 F.3d at 1019; Section II.C, *supra*. "For [a plain] error to have affected substantial rights, the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *United States v. Meacham*, 567 F.3d 1184, 1190 (10th Cir. 2009) (internal quotation marks omitted). And to show that a sentencing error affects the fairness, integrity, or public reputation of judicial proceedings, "the defendant must demonstrate a strong possibility of receiving a significantly lower sentence." *Id.* (internal quotation marks and alterations omitted).

Ms. Edwards can make neither of these showings because there's no indication her sentence would have been different had transaction 1U been excluded. With the 14-level enhancement for loss exceeding $400,000, Ms. Edwards's offense level was 25, which, given her criminal history category of I, corresponded to an advisory Guidelines range of 57-71 months. The district court granted a generous downward variance, however, ultimately sentencing Ms. Edwards to 41 months' imprisonment and noting that this term fell within the Guidelines range for an offense level of 20, which the defense had requested. *See* Edwards R. Vol. V at 2817, 2825. Had transaction 1U been excluded from the loss calculation, Ms. Edwards would have fallen slightly below the $400,000 threshold for a 14-level increase, but still would have been subject to a 12-level increase. And that would have resulted in a Guidelines sentence of 46-57 months, still well above what she actually received. Thus, even if including transaction

- 43 -

1U was a procedural error, we can't say it affected Ms. Edwards's substantial rights or impugned the integrity of the district court proceedings. *Cf. United States v. Lopez-Mendoza*, 332 F. App'x 498, 500 (10th Cir. 2009) (unpublished); *United States v. Herrera-Gonzalez*, 304 F. App'x 694, 697 (10th Cir. 2008) (unpublished).[13]

E

Finally, Ms. Edwards submits that the district court misallocated the burden of proof in determining the amount of her criminal forfeiture pursuant to 18 U.S.C. § 982. The key issue at the forfeiture hearing was which transactions should be considered part of the fraudulent scheme underlying Ms. Edwards's wire fraud convictions; the gross proceeds from such transactions would then be subject to forfeiture. According to Ms. Edwards, instead of requiring the government to prove by a preponderance of the evidence which transactions were part of the scheme, the district court put it to her to disprove which transactions were not. Ms. Edwards failed to make this objection to the district court, so we review only for plain error. *See Hutchinson*, 573 F.3d at 1019; Section II.C, *supra* (describing four-part plain error test). We see none.

Ms. Edwards's argument rests entirely on a statement by the district court at her forfeiture hearing:

---

[13] Ms. Edwards attacks her restitution order on identical grounds and offers no reason why a different result should pertain there. We thus affirm the district court's restitution order as well.

> Therefore, the Court cannot find that the jury found that all of these transactions [offered by the government] were part of the scheme; but the Court has reviewed the trial record, and using the preponderance of evidence standard which is applicable to the forfeiture finds *in the absence of evidence to the contrary* that the transactions on Exhibit 2 are subject to a forfeiture award and therefore intends to award — to impose a forfeiture judgment of $139,854.96.

Edwards R. Vol. III at 2827 (emphasis added). Ms. Edwards reads the emphasized language to mean that, in the eyes of the district court, the government satisfied its burden of proof only because she failed to introduce evidence to the contrary. We think, however, that the quoted passage demonstrates that the district court did precisely its duty in assessing the evidence about forfeitable proceeds. It reviewed the trial record and concluded that the evidence there supported finding many — but not all — of the offered transactions part of Ms. Edwards's fraudulent scheme. The comment Ms. Edwards challenges reflects nothing more than the court's observation that no contradictory evidence cast doubt on that conclusion. Though Ms. Edwards was of course under no obligation to provide evidence showing the transactions weren't part of the scheme, in the absence of such evidence it can hardly surprise that the government's forfeiture evidence may then constitute a preponderance of all the evidence on that score.

* * *

The judgment of the district court, with respect to both Ms. Mullins and Ms. Edwards, is

*Affirmed*.