FILED
United States Court of Appeals
Tenth Circuit

July 24, 2015

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

　　　　Plaintiff–Appellee,

v.

JEFFREY CHARLES ZANDER,

　　　　Defendant–Appellant.

No. 13-4174

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:10-CR-01088-DN-1)**

---

Theresa M. Duncan, Albuquerque, New Mexico, for Defendant–Appellant.

Scott J. Thorley, Office of the United States Attorney (Carlie Christensen, Acting United States Attorney, and Elizabethanne C. Stevens, Assistant United States Attorney, on the brief), Salt Lake City, Utah, for Plaintiff–Appellee.

---

Before **MATHESON, McKAY,** and **MORITZ,** Circuit Judges.

---

**McKAY**, Circuit Judge.

---

Defendant Jeffrey Zander was convicted of two counts of mail fraud, two counts of wire fraud, one count of money laundering, and three counts of willful failure to file federal tax returns. He was sentenced to sixty-eight months of imprisonment and ordered to pay $202,543.92 in restitution to the Paiute Indian Tribe of Utah, the main victim of his

fraud. On appeal, he challenges his convictions on the mail fraud, wire fraud, and money laundering counts. He also challenges the length of his sentence and the amount of restitution awarded to the Tribe.

**I.**

The fraud and money laundering counts at issue in this appeal all arose out of Defendant's scheme to divert federal grant money intended for the Paiute Indian Tribe for his own personal use.

The Paiute Indian Tribe of Utah is a federally recognized Indian tribe located in southern Utah, which consists of five distinct bands: the Cedar, Indian Peaks, Kanosh, Koosharem, and Shivwits bands. The Tribe's main asset is the reservation land held in trust by each of its bands.

Defendant began working for the Tribe as a tribal planner in 1998, and he subsequently became the Tribe's trust resource and economic development director. As a director, Defendant worked independently with minimal supervision. In about 2004 or 2005, Defendant suggested the Tribe seek federal grant money to fund the development of an Integrated Resource Management Plan—a comprehensive, long-term plan regarding the use, development, and management of tribal resources and assets—for each of the Tribe's bands. Tribal officials agreed the Tribe and bands would greatly benefit from the development of IRMPs to guide their resource management decisions.

Between 2005 and 2007, Defendant prepared grant proposals to request funding from the Bureau of Indian Affairs for the Tribe to develop an IRMP for each of its bands.

In each grant proposal, Defendant represented that most of the grant proceeds would be used to hire and pay an outside consultant and facilitator to assist the Tribe, since "[t]here is no resident community expertise in natural resources management, strategic planning, or economics." (Supplemental R. Exs. 1-1 p. 11, 1-2A p. 4, 1-3 p. 8, 1-4 p. 13, 1-6 p. 13.) The grant proposal for each band's IRMP was approved by that band's council and by the Tribal Council, then submitted to the BIA. The completed submission forms described Defendant as the person to be contacted regarding the proposals and listed his fax number as well as the Tribal office's mailing address in the pertinent contact information.

The agency approved and awarded the following five IRMP development grants: $25,000.00 for the Koosharem Band in July 2005; $28,000.00 for the Indian Peaks Band in August 2006; $28,000.00 for the Kanosh Band in August 2006; $34,500.00 for the Cedar Band in August 2007; and $49,500.00 for the Shivwits Band in August 2007. A BIA awarding official notified the Tribe of each grant's approval by mailing the Tribe a grant award package from her office in Arizona to the Tribe's offices in Utah via certified mail. Each grant agreement provided that grant funds would be transferred to the Tribe's bank account through an Automated Clearinghouse electronic transfer.

Instead of hiring an outside consultant and facilitator to help develop IRMPs for each band, Defendant created false invoices and purchase orders for four fictitious companies and represented to the Tribe that these companies had provided consulting and facilitating services for the IRMP development projects. Based on these representations, the Tribe issued checks made out to these nonexistent companies and, at Defendant's

-3-

direction, either mailed the checks to post office boxes that were actually owned or controlled by Defendant or gave them to Defendant to hand-deliver to the purported companies.

After issuing these checks, the Tribe requested reimbursement from the BIA under the IRMP grants. The local BIA office approved each of the Tribe's reimbursement requests. After approving a request, the local office would fax the approved reimbursement form to a BIA processing center in Reston, Virginia. In accordance with the terms of the grant agreements, the government reimbursed the Tribe by wiring grant funds via an ACH transfer from the United States Treasury in Kansas City, Missouri, to the Tribe's bank account in Utah.

Defendant submitted progress reports to the government in which he represented that consulting and facilitating companies were actively involved in each of the IRMP development projects. He also represented that he traveled out of town and sometimes out of state to meet with these companies and work on the different IRMP projects. On at least one occasion, Defendant submitted his progress report to the BIA via fax.

Defendant deposited the checks made out to the fictitious companies into his personal checking accounts. He then spent the funds for his personal benefit, including using them to make a down payment on a home he purchased in November 2007. Although he expended all $165,000.00 of the IRMP grant funds awarded by the BIA, Defendant completed only one four-page IRMP for the Koosharem Band. A prosecution witness testified at trial that other IRMPs she had seen "vary in pages from a minimum of

-4-

50 to over a hundred." (R. at 903.)

The Tribe learned of Defendant's scheme in March 2008 after a bank employee called the Tribe to ask about a check made out to one of Defendant's nonexistent businesses which he had attempted to deposit into his personal account. Following a short investigation, the Tribe fired Defendant. According to a Tribal representative, the Tribe thereafter received a notice of collection from the government seeking repayment of the grant funds based on the Tribe's failure to produce the IRMPs the grants were intended to fund.

In February 2012, a federal grand jury indicted Defendant on two counts of mail fraud in violation of 18 U.S.C. § 1341, two counts of wire fraud in violation of 18 U.S.C. § 1343, one count of money laundering in violation of 18 U.S.C. § 1957, and three counts of failure to file federal tax returns in violation of 26 U.S.C. § 7203. The four fraud counts all stem from the last two grants Defendant obtained as part of his scheme—the August 2007 grants for the Cedar Band's and Shivwits Band's IRMPs. Specifically, the two mail fraud counts arose from the mailing of the grant award packages for these grants from the BIA office in Arizona to the Tribal office in Utah. The two wire fraud counts arose from: (1) a February 2008 fax from a BIA office in Utah to a BIA office in Virginia regarding reimbursement for various Tribal grant expenses, including expenses incurred under these two IRMP grants; and (2) a February 2008 ACH transfer from the U.S. Treasury in Missouri to the Tribe's bank in Utah, which included funds allocated for the IRMP grants. The money laundering count arose from Defendant's use of funds

obtained through the IRMP grants to purchase a cashier's check for a down payment on his house. Finally, the three tax-related counts—none of which are at issue in this appeal—were based on Defendant's failure to file a tax return for the years 2005, 2006, and 2007.

After a seven-day trial, a jury found Defendant guilty on each of the counts in the indictment. The district court denied Defendant's Rule 29 motion for a judgment of acquittal, holding there was sufficient evidence to sustain a conviction on each of the challenged counts.

Prior to Defendant's sentencing, the probation office prepared a presentence report. This PSR stated Defendant had received a total of $176,698.00 as a result of his fraud,[1] and the PSR accordingly included a ten-level enhancement for the fraud offenses based on a loss between $120,000.00 and $200,000.00. *See* U.S.S.G. § 2B1.1(b)(1)(J). Based on this calculation, the PSR calculated a total offense level of 24 and a guideline range of 51 to 63 months of imprisonment. The PSR also reported Defendant owed $176,698.00 in restitution to the Tribe.

An attorney for the Tribe prepared a victim impact statement, which was attached to the PSR. In this statement, the Tribe reported that, in addition to the money Defendant directly took from the Tribe, the Tribe "has had to absorb the costs associated with

---

[1] Although the BIA only awarded the Tribe a total of $165,000 for the five IRMP development grants, the Tribe contributed additional amounts to the IRMP projects out of Tribal funds, and Defendant's fraud caused a loss of these Tribal funds as well.

hundred of hours of lost employee time[ and] attorney's fees." (Doc. 198-2 at 25.) Moreover, the Tribe had to pay into a state unemployment fund for the unemployment benefits Defendant received from the state of California after his termination in 2009 from a subsequent, unrelated job in California. The Tribe included a financial impact worksheet that specified various losses associated with Defendant's actions: $176,698.00 in stolen funds; $13,910.00 for attorneys fees "associated with the FBI and Department of Justice investigation and prosecution, responses to Zander's subpoena requests, Department of the Interior attempts to recoup the embezzled funds, state charges against Zander for the trespass into the Tribal building, unemployment benefits improperly paid to Zander, termination, and related Zander requirements"; $10,000.00 for the salary increase Defendant was promised in exchange for working as the Tribe's general counsel; $8,339.98 for unemployment benefits paid to the Utah Department of Workforce Services; and $3,595.94 for "lost wages and employees time and travel related to Zander case." (*Id.* (capitalization standardized).)

Defendant objected to the PSR's loss calculation of $176,698.00 and the recommended award of restitution in the same amount. He argued the loss calculation and restitution should be based solely on the funds he received from the two grants which formed the basis for his convictions, not the amount he received from the IRMP scheme as a whole. The probation office declined to modify the recommended loss and restitution amounts.

At Defendant's sentencing hearing, the district court asked the government why

the additional losses described in the Tribe's victim impact statement had not been included in the loss calculation. A government attorney replied that "the government has been operating under the agreed upon amount of $176,698.00 and was unaware, until receiving this exhibit, of the additional [loss]." (Doc. 232 at 7.)

The district court initially stated it would apply the PSR's loss figure of $176,698.00. However, the court then heard testimony from a Tribal representative about the extensive negative consequences suffered by the Tribe as a result of Defendant's fraud. The court asked several questions about the Tribe's losses, and another Tribal representative explained the way the Tribe had calculated the specific losses claimed on the financial impact worksheet. Following this explanation, the court concluded there was "some substantiation of amounts" relating to the Tribe's claimed losses of $13,910.00 in legal fees, $8,339.98 in unemployment benefits paid to Defendant, and $3,595.94 for Tribal employees' time and travel costs associated with this case. (*Id.* at 36.) The court found that the Tribe had failed to substantiate only its claimed loss of $10,000.00 for Defendant's general counsel salary increase.

The court then asked Defendant to address the Tribe's additional claims of loss. Defense counsel stated it was hard for her to address claims of loss which had just been brought up for the first time. She raised a specific objection to the claim of loss for Tribal employees' time and travel costs, but indicated she would need more time to respond to the claims of loss for unemployment benefits and attorneys fees.

After considering all of the parties' arguments and evidence, the court found the

correct amount of restitution to be $202,543.92, based on all of the Tribe's claimed losses except the requested $10,000.00 for Defendant's salary increase.  The court noted that Defendant's objection to the amount of restitution was "preserved for the record."  (*Id.* at 59.)  The court also relied on this new $202,543.92 figure for the sentencing loss calculation, which raised Defendant's offense level by one level and increased his recommended sentencing range to 57–71 months.  Based on this calculation, the court sentenced Defendant to a within-guidelines sentence of 68 months' imprisonment.

## II.

Defendant raises five main issue on appeal:  (1) a sufficiency-of-the-evidence challenge to his mail fraud convictions; (2) a sufficiency-of-the-evidence challenge to his wire fraud convictions; (3) a conditional challenge to his money laundering conviction; (4) a challenge to the procedural reasonableness of his sentence; and (5) a challenge to the district court's award of $202,543.92 in restitution to the Tribe.

We first consider Defendant's challenge to the sufficiency of the evidence supporting his two mail fraud convictions.  We review the sufficiency of the evidence de novo, "viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government." *United States v. Grassie*, 237 F.3d 1199, 1207 (10th Cir. 2001) (internal quotation marks omitted).  "We will reverse a conviction only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Willis*, 476 F.3d 1121, 1124 (10th Cir. 2007) (internal quotation marks omitted).

A mail fraud conviction under 18 U.S.C. § 1341 requires evidence of "(1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of the mails to execute the scheme." *United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003). The third element of this test does not require use of the mails to be an essential element of the fraudulent scheme; rather, "'[i]t is sufficient for the mailing to be incident to an essential part of the scheme or a step in the plot.'" *United States v. Washington*, 634 F.3d 1180, 1183 (10th Cir. 2011) (quoting *Schmuck v. United States*, 389 U.S. 705, 710-11 (1989)). Nor does the defendant need to use the mails himself: It is sufficient "if the perpetrator does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Washington,* 634 F.3d at 1183-84. In other words, a defendant commits mail fraud if he "set[s] forces in motion which would involve mail uses." *United States v. Worley*, 751 F.2d 348, 350 (10th Cir. 1984) (internal quotation marks and ellipses omitted). "The only causation required by the mail fraud statute is whether the defendant could reasonably foresee the occurrence of mailings." *Id.*

On appeal, Defendant does not dispute the government's evidence of a scheme and intent to defraud, but he contends the government failed to present sufficient evidence to satisfy the third element of the mail fraud test. He argues the connection between his conduct and the charged mail uses—the BIA's August 2007 mailings of two grant award packages to the Tribe—is too attenuated to show that he set forces in motion which would

-10-

involve use of the mails. While he does not dispute he drafted the proposals for the grants awarded in the BIA's August 2007 mailings, Defendant stresses he was not authorized to submit these grant proposals to the BIA, so they could only be submitted if the Tribe passed a resolution to pursue the grants. Moreover, he points out that the BIA review board does not approve all IRMP grant proposals. Thus, Defendant argues, "[t]he chain [of causation] is simply too long and too attenuated to support his conviction." (Appellant's Opening Br. at 21.)

We find this argument unpersuasive. In essence, Defendant argues he did not foreseeably cause the use of the mails because either the Tribe or the BIA could have inadvertently thwarted his fraudulent scheme by rejecting the grant proposals, and if they had done so, the BIA would not have mailed the grant award packages to the Tribe. However, the fact that the grant award packages would not have been mailed if the fraudulent scheme had failed does not make the chain of causation too attenuated to be foreseeable. A reasonable person in Defendant's position could have foreseen that his scheme, if successful, would result in the use of the mails, and this is enough to satisfy the foreseeability requirement.

Defendant also argues his fraudulent scheme did not actually cause the use of the mails because federal law requires the development of management plans for Indian tribes by either the tribe or the Secretary of the Interior, *see* 25 U.S.C. § 3711(b), so the Paiute Indian Tribe of Utah would likely have pursued the IRMP development grant funds in any event. Thus, he argues, even if he had not suggested the Tribe pursue the

-11-

IRMP grants and drafted the grant proposals to do so, the Tribe would likely have still pursued this course and thereby caused the BIA to mail a grant award package to the Tribe.

Defendant cites to no evidence supporting this speculation, and he does not even attempt to argue that the contents of the grant award packages would have been the same absent the scheme. Moreover, the hypothetical possibility that individuals might have legitimately engaged in a course of conduct which could have led to a similar use of the mails does not negate the government's evidence that the defendant actually set forces in motion which led to mail usage in connection with the fraudulent scheme.

In *Schmuck v. United States*, 489 U.S. 705 (1989), the Supreme Court considered the validity of several mail fraud convictions that arose out of an odometer-tampering scheme. The government presented evidence that the defendant rolled back the odometers on several automobiles, then marketed them to several retail dealers at artificially inflated prices. "These unwitting car dealers, relying on the altered odometer figures, then resold the cars to customers, who in turn paid prices reflecting Schmuck's fraud." *Id.* at 707. As required by law, the dealers completed the resale of each automobile by submitting a title-application form to the Wisconsin Department of Transportation on behalf of the retail customer. *Id.* The defendant's mail fraud convictions were based on the dealers' mailings of these title-application forms. In affirming these convictions, the Supreme Court rejected the defendant's argument that a mail fraud conviction cannot be based on routine mailings that are innocent in

-12-

themselves. The Court held that the defendant could appropriately be convicted of mail fraud because the dealers' mailings of the title-application forms resulted from the defendant's fraudulent scheme and served an essential role in his scheme.

The defendant in *Schmuck* could have legitimately sold automobiles with non-fraudulent odometer readings, and the retail dealers would still have been required by law to mail title-application forms for the automobiles they resold. Similarly, the Tribe could have legitimately sought and obtained IRMP grant funds, and the BIA would have arguably still been required to mail grant award packages to the Tribe.[2] However, the fact that a similar mailing might have been made absent the fraud is irrelevant to the pertinent inquiry—whether the defendant's fraudulent scheme actually set forces in motion foreseeably leading to the use of the mails incident to an essential part of his scheme. If the government's evidence satisfies this inquiry, it is sufficient to prove "[t]he only causation required by the mail fraud statute," *Worley*, 751 F.2d at 350. The government need not disprove any possibility the defendant could have engaged in legitimate conduct which might have led to similar mail usage.

Defendant further argues the BIA's mailings were not part of the execution of the fraudulent scheme because "[t]he fraud, if any, occurred when Mr. Zander billed the Tribe for work that he was not authorized to perform," and his misrepresentations to the

---

[2] The government contests Defendant's argument that the BIA was legally required to use the mails to send the grant award packages to the Tribe. We need not resolve this issue based on our conclusion that it is irrelevant whether the mailings became legally required as a result of Defendant's fraudulent scheme.

Tribe had nothing to do with the government's decision to approve the grants and mail the grant award packages to the Tribe. (Appellant's Opening Br. at 23.) However, the mail fraud statute does not require a direct connection between fraudulent misrepresentations and the use of the mails. Rather, "[i]t is sufficient for the mailing to be incident to an essential part of the scheme or a step in the plot." *Schmuck*, 489 U.S. at 710-11 (internal quotations marks, citation, and brackets omitted).

We conclude that the mailings in this case were incident to an essential step of this scheme—the BIA's award of the grants to the Tribe. Indeed, according to Defendant's own arguments, these mailings were a necessary part of this essential step of the scheme, since Defendant contends the BIA was legally required to use the mails to sent the grant award packages to the Tribe once they were approved.[3] We thus conclude that the government presented sufficient evidence for the jury to rationally find that Defendant set forces in motion which foreseeably led to use of the mails incident to an essential step in

_____

[3] In his reply brief, Defendant argues the BIA's award of the grants was not an essential part of his scheme, since the Tribe paid for some IRMP-related work for the Shivwits and Cedar bands before it received the BIA's grant awards for these bands' IRMPs. Defendant did not raise this argument in his opening brief, and it is therefore waived. *See Stump v. Gate*, 211 F.3d 527, 533 (10th Cir. 2000). Moreover, as the Supreme Court has explained, "[t]he relevant question at all times is whether the mailing is part of the execution of the scheme *as conceived by the perpetrator at the time*." *Schmuck*, 489 U.S. at 715 (emphasis added). As conceived by Defendant at the time, the scheme required the BIA to award the IRMP grants so the Tribe would have a pool of funds Defendant could fraudulently take as the Tribe's trust resource and economic development director. Even if the Tribe's later actions arguably suggested the scheme could have succeeded without the BIA's grant approval, the evidence still supports the conclusion that the mailings were "part of the execution of the scheme as conceived by [Defendant] at the time." *Id.*

Defendant's fraudulent scheme.

Defendant also argues his mail fraud convictions must be reversed because the grant award packages contained no false or misleading information and the BIA was required to mail these packages once it approved the grants. For support, he quotes a sentence from our opinion in *United States v. Lake*, 472 F.3d 1247 (10th Cir. 2007), which states that "mailings of documents which are required by law to be mailed, and which are not themselves false and fraudulent, cannot be regarded as mailed for the purpose of executing a fraudulent scheme." *Id.* at 1256 (internal quotation marks omitted). He also relies on the Supreme Court's opinion in *Parr v. United States*, 363 U.S. 370 (1960).

However, "[t]o the extent that [Defendant] would draw from these . . . cases a general rule that routine mailings that are innocent in themselves cannot supply the mailing element of the mail fraud offense, he misapprehends this Court's precedents." *Schmuck*, 489 U.S. 714-15. A detailed review of the *Parr* and *Lake* decisions—particularly in light of the Supreme Court's further discussion of these issues in *Schmuck*—convinces us these cases are distinguishable and do not prevent the mailings in this case from forming the basis for Defendant's mail fraud convictions.

In *Parr*, various individuals associated with a local school district defrauded the district and its taxpayers of district funds through various means such as cashing checks issued to fictitious persons. 363 U.S. at 381. The defendants were convicted of mail fraud based on their mailing of the tax notices and remittances which were necessary to

-15-

collect taxes to fund the school district. *Id.* at 385-86. However, the Supreme Court noted that "the indictment did not expressly or impliedly charge, and there was no evidence tending to show, that the taxes assessed were excessive, 'padded,' or in any way illegal." *Id.* at 387. Moreover, the government did not question that the defendants were required by state law to use the mail to collect the district's taxes. *Id.* at 388. Under these circumstances, the Court in *Parr* held that the defendants had not committed mail fraud by mailing documents they were legally required to mail, regardless of their scheme to later steal some indefinite part of the funds which would be legally acquired through these documents.

Our reversal of the defendants' wire fraud convictions[4] in *Lake* was likewise based upon the facts that (1) the predicate transmissions were required by law, and (2) there was no evidence the documents would have differed in any respect in the absence of the fraudulent scheme. In *Lake*, the defendants allegedly "conducted a far-reaching scheme to milk the company [they ran] for all they could through a pattern of fraud and deceit." 472 F.3d at 1249. "Despite the scope of the alleged fraudulent scheme, all the counts of the indictment depended on proving the efforts of the defendants to conceal from the United States Securities and Exchange Commission (SEC) their personal use of corporate aircraft." *Id.* at 1249-50. Specifically, the government alleged the defendants committed

---

[4] The requisite elements for mail fraud and wire fraud are "virtually identical," so interpretations of one statute "are authoritative in interpreting parallel language" in the other. *United States v. Weiss*, 630 F.3d 1263, 1263 (10th Cir. 2010) (internal quotation marks omitted).

wire fraud based on their company's transmission of required SEC reports which failed to disclose the defendants' personal use of corporate aircraft. *Id.* However, we concluded that the government had failed to prove the defendants were actually required to disclose their aircraft use in the SEC reports. Thus, regardless of whether the defendants otherwise defrauded the company of its assets, "[a]s far as the trial evidence showed, even in the absence of a fraudulent scheme the seven reports would have been filed and the contents would have been the same." *Id.* at 1255. "Consequently," we held, "we cannot see how their filing advanced the alleged fraudulent scheme or how one could say that the defendants' purpose in filing them was to advance the scheme." *Id.* at 1255-56. Relying on *Parr*, we accordingly reversed the wire fraud convictions.

The Supreme Court's *Schmuck* decision clarifies that *Parr*'s holding applies only to cases like *Parr* and *Lake*, where the transmissions at issue were not caused or changed by the fraudulent scheme and cannot be considered incident to an essential part of the scheme. In *Schmuck*, the Court rejected the defendant's argument that *Parr* and similar cases do not permit a mail fraud conviction to be based on routine, legally required mailings which are innocent in themselves. Rather, the Court held, "[t]he relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time." *Id.* at 715. The Court concluded that a jury could reasonably find the long-term success of the defendant's odometer-rollback scheme to depend on dealers complying with their legal requirement to mail title-application forms to the state. Moreover, while the mailings in *Parr* "would have been made

-17-

regardless of the defendants' fraudulent scheme, the mailings in [*Schmuck*], though in compliance with Wisconsin's car-registration procedure, were derivative of Schmuck's scheme to sell 'doctored' cars and would not have occurred but for that scheme." *Id.* at 713 n.7. A reasonable jury could accordingly conclude that the dealers' mailings of the title-registration forms were caused by the fraudulent scheme and were incident to an essential part of the scheme, thus satisfying the mail fraud requirements. *Id.* at 712.

The mailings in this case, like the mailings at issue in *Schmuck*, resulted from the fraudulent scheme and are incident to an essential part of this scheme, even if they might be considered routine and innocent in themselves. As in *Schmuck*, Defendant's actions set forces in motion which foreseeably led to the use of the mails. Once these forces were set in motion, the BIA in this case—like the retail dealers in the *Schmuck* case—may have been legally required to use the mail to send certain documents. However, it is irrelevant whether mailings become legally required after the defendant sets these forces in motion, so long as the defendant did in fact set these forces in motion and "the mailing is part of the execution of the scheme as conceived by the perpetrator at the time." *Id.* at 1450. The government presented sufficient evidence to support these conclusions in this case, and we therefore affirm Defendant's mail fraud convictions.

Next, Defendant challenges the sufficiency of the evidence on his wire fraud convictions. The elements of wire fraud are extremely similar to the elements of mail fraud, requiring evidence of "(1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to

defraud, and (3) use of interstate wire or radio communications to execute the scheme."
*United States v. Ransom*, 642 F.3d 1285, 1289 (10th Cir. 2011) (internal quotation marks omitted). "Because the requisite elements of the two statutes are virtually identical, this court has held interpretations of § 1341 are authoritative in interpreting parallel language in § 1343." *United States v. Weiss*, 630 F.3d 1263, 1271 n.5 (10h Cir. 2010).

As with his mail fraud convictions, Defendant challenges the government's evidence only as to the third element of the wire fraud test.  He contends he did not cause and could not reasonably have foreseen the two wire transmissions described in the wire fraud counts—an internal BIA fax relating the Tribe's reimbursement requests, and an ACH transfer from the U.S. Treasury to the Tribe's bank account in Utah—because there was no evidence he knew about the BIA's internal communication methods or the banking aspects of the Tribe's business.

This argument misapprehends the pertinent test.  The relevant question is not whether Defendant knew or could reasonably have foreseen the details of these specific transmissions.  Rather, "it's enough if [he] set forces in motion which foreseeably would involve use of the wires." *United States v. Mullins*, 613 F.3d 1273, 1281 (10th Cir. 2010) (internal quotation marks omitted).  As we explained in rejecting a similar argument in *Mullins*, "we are concerned with whether 'the use of the wires in the ordinary course of business,' not the precise use of 'this or that wire,' was known or reasonably foreseeable to someone in [Defendant's] position." *Id.* (quoting *United States v. Wittig*, 575 F.3d 1085, 1099 (10th Cir. 2009) (ellipses omitted).  In *Mullins*, we concluded the defendant

could reasonably foresee use of the wires to transmit FHA loans "in light of evidence that wire transmission are integral to other parts of real estate transactions" with which the defendant was familiar. *Id.*

We similarly hold in this case that the government presented sufficient evidence to support the conclusion that Defendant could have reasonably foreseen use of the wires incident to an essential part of his fraudulent scheme. At the time Defendant prepared and submitted the two IRMP grant proposals which formed the basis for his wire fraud convictions, he had already successfully obtained three similar IRMP grants. Like the two grants underlying his convictions, each of the prior grants contained an identical provision stating the Tribe would receive its grant funds through ACH wire transmissions. Additionally, the grant submissions included Defendant's fax number in the contact information, and he personally used at least one fax transmission to communicate with the BIA regarding his progress on the Koosharem Band IRMP project. Based on this previous course of dealings as well as the IRMP grant language, the jury could rationally find that the use of the wires was reasonably foreseeable to Defendant. The jury could also rationally find that the particular wire uses at issue in this case were incident to an essential part of Defendant's scheme, since they related to the payment of grant funds from the BIA to the Tribe to continue covering Defendant's fraudulently claimed expenses.

Defendant also challenges his wire fraud convictions on the ground that the wire transmissions would have occurred regardless of his fraudulent scheme, since the fax and

the ACH transfer involved a larger sum of grant funds from other unrelated grants as well as a reimbursement request for the IRMP grants involved in the fraud. However, the evidence indicates the contents of these transmissions—unlike the transmissions at issue in *Parr* and *Lake*—would have differed absent the fraudulent scheme; were it not for the scheme, these transmissions would not have sought reimbursement of the grant funds Defendant had fraudulently taken. The fact that the transmissions also furthered legitimate purposes does not insulate Defendant from liability for this foreseeable use of the wires incident to an essential part of his fraudulent scheme. Indeed, these circumstances are similar to the "classic mail fraud" case in which defendants knowingly send illegally inflated invoices to customers, including fraudulent as well as legitimate charges on the invoices and thus altering the contents of the transmission that would have been sent absent the fraud. *Sandwich Chef of Tex., Inc. v. Reliance Nat. Indem. Ins. Co.*, 319 F.3d 205, 215 (5th Cir. 2003). In such a case, both the inflated invoice and the payment check sent in response can support a mail fraud conviction, even though an invoice and check would still have been sent absent the fraud, albeit in a lower amount. *See United States v. Shyres*, 898 F.2d 647, 652-53 (8th Cir. 1990). This situation is analogous. Defendant's fraud caused the contents of both the BIA fax and the ACH transfer to differ from the transmissions which would have occurred absent the fraud, and these differences furthered the fraudulent scheme.

Based on all of the evidence, the jury could rationally find that Defendant's fraudulent scheme set forces in motion which foreseeably led to the use of wire

transmissions incident to an essential part of the scheme. We accordingly affirm his convictions on both wire fraud counts.

The third issue Defendant raises on appeal is a conditional challenge to his money laundering conviction. He argues that if we reverse his mail and wire fraud convictions, we should also reverse his conviction for laundering the money obtained through his alleged fraud. He does not otherwise challenge his money laundering conviction. Because we affirm his fraud convictions, we likewise affirm his conviction for money laundering.

Defendant's fourth argument on appeal is a challenge to the procedural reasonableness of his 68-month sentence. He contends the district court erred in applying the 12-level sentencing enhancement applicable to losses between $200,000.00 and $400,000.00, rather than the PSR's recommended 10-level enhancement for a loss between $120,000.00 and $200,000.00. *See* U.S.S.G. § 2B1.1(b)(1). He argues the court erred by including $3,595.94 for the Tribe's lost wages and travel costs, $13,910.00 for the Tribe's attorneys fees, and $8,339.98 for Defendant's unemployment benefits, to reach a total loss figure of $202,543,92.

The government concedes at least some of these costs were improperly included in the loss calculation and the loss calculation should have fallen within the $120,000.00–$200,000.00 range, resulting in a lower offense level and corresponding advisory guideline range. Based on the government's concession, we will reverse and remand for resentencing in accordance with this corrected loss calculation.

Finally, Defendant argues the district court erred in awarding the Tribe $202,543.92 in restitution. He objects to the court's inclusion of the same losses he objected to with respect to the court's loss calculation: lost wages and travel costs, attorneys fees, and unemployment benefits. He contends these losses are not the types of direct damages covered by the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A.

The government argues we should review this issue only for plain error because Defendant failed to raise below the specific arguments he makes on appeal.[5] Defendant contends he sufficiently raised these arguments, particularly given the fact that he was not

------

[5] The government also argues that Defendant waived even plain error review by failing to address the plain error standard in his opening brief on appeal. For support, the government relies on our statement in *Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011), that "the failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court."

In *United States v. MacKay*, 715 F.3d 807, 831-82 & n. 17 (10th Cir. 2013), we noted that there is an open question in this circuit as to whether an appellant can satisfy *Richison* by addressing plain error review in a reply brief rather than an opening brief. While we did not resolve this issue in *MacKay*, we suggested that allowing a plain error argument to be raised for the first time in a reply brief would arguably still serve the purposes of permitting the appellee to be heard and the adversarial process to be served.

Moreover, if we were to adopt the opposite rule, appellants would be required to anticipate and raise an alternative plain error argument whenever the government might disagree with the appellant's view that he has sufficiently preserved an issue for appeal. While raising an alternative plain error argument might be a prudent practice for appellants to follow, we are not persuaded that it is mandated by *Richison* or our other precedents. We hold that Defendant adequately addressed the issue of plain error review in his reply to the government's brief, after arguing in his opening brief that his objections below were sufficiently raised to be preserved for review on appeal. We need not here resolve the question of whether this same rule would apply when there is no dispute that the appellant failed to raise an issue below and the appellant fails to address any standard of review in his opening brief on appeal.

on notice of the court's intention to sua sponte award an amount of restitution higher than the amount recommended in the PSR. We need not resolve this dispute because we conclude the award of restitution must be remanded even if we review under the plain error standard advocated by the government.

Under the Mandatory Victim Restitution Act, "the general rule [is] that restitution may only be ordered for losses caused by the offense of conviction." *United States v. West*, 646 F.3d 745, 751 (10th Cir. 2011) (internal quotation marks omitted). Thus, before awarding restitution, the district court must determine whether the crime of conviction was the proximate cause of the victim's loss. *Id.*; *see also*, *e.g.*, *United States v. Diamond*, 969 F.2d 961, 967-68 (10th Cir. 1992). The crime of conviction will not be considered the proximate cause of the loss if there was an intervening cause, unless this intervening cause was "directly related to the offense conduct." *United States v. Speakman*, 594 F.3d 1165, 1172 (10th Cir. 2010). Restitution also may not be based on consequential damages. *Diamond*, 969 F.2d at 968. "Expenses generated in recovering a victim's losses, [for instance], generally are too far removed from the underlying criminal conduct to form the basis of a restitution order." *Id.*

We have repeatedly held that a restitution order which exceeds the amount of loss actually caused by the offense of conviction is an illegal sentence. *See, e.g.*, *United States v. Griffith*, 584 F.3d 1004, 1019 (10th Cir. 2009); *United States v. Smith*, 156 F.3d 1046, 1057 (10th Cir. 1998); *United States v. Wainwright*, 938 F.2d 1096, 1098 (10th Cir. 1991). We have also repeatedly held that the imposition of such an illegal sentence

constitutes plain error, thus requiring reversal even when the defendant failed to preserve an objection below. *See*, *e.g.*, *United States v. Gordon*, 480 F.3d 1205, 1212 (10th Cir. 2007); *Wainwright*, 938 F.2d at 1098. Moreover, the government bears the burden of proving the amount of loss, 18 U.S.C. § 3664(e), and a district court commits plain error if it orders restitution where the government has failed to present evidence that the victim's claimed losses were actually caused by the underlying criminal conduct. *United States v. Herndon*, 982 F.2d 1411, 1422 (10th Cir. 1992).

A review of the Tribe's claimed loss of $8,339.98 for unemployment benefits demonstrates the error that occurred in this case. While the district court found the *amount* of the claimed loss to be substantiated, it failed to consider whether the government had presented evidence that this loss was directly and proximately caused by the crime of conviction. Our review of the record convinces us that such evidence was entirely lacking. The Tribe's victim impact statement and related documents indicate that Defendant began working for an unrelated employer in California after he was terminated from employment with the Tribe. A few months later, his California employer also terminated him. According to the newspaper articles the Tribe attached to its victim impact statement, the California employer denied that his termination had anything to do with his background, including his fraudulent conduct during his previous employment with the Tribe. Following this second, unrelated termination, Defendant sought and obtained unemployment benefits from California, which billed the Utah Department of Workforce Services through an interstate wage claim. The Utah agency then billed the

-25-

Tribe because Defendant had worked there for an extended period, and the Tribe paid this claim in full to avoid legal penalties.

The government presents no evidence or argument to support the conclusion that Defendant's crimes of convictions were the proximate cause of the Tribe's later payment of unemployment benefits arising out of a subsequent termination from an unrelated California employer for reasons allegedly unrelated to his fraud on the Tribe. Without such evidence, the district court imposed an illegal sentence when it included this claimed loss in the award of restitution, thus committing plain error. This error requires us to remand for reconsideration of the restitution award under the correct legal standards.

The district court likewise failed to consider whether the Tribe's other claimed losses were directly and proximately caused by Defendant's crimes of conviction. We will not attempt to resolve these disputed, fact-intensive questions for the first time on appeal, but rather leave these questions for the district court to decide in the first instance on remand.

## III.

For the foregoing reasons, we **AFFIRM** Defendant's convictions. We **REVERSE** and **REMAND** his sentence and order of restitution for further consideration.

-26-