**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 29, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DEMONTRAE WILSON,

    Defendant - Appellant.

No. 19-1198
(D.C. No. 1:18-CR-00263-RM-1)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HOLMES**, **SEYMOUR**, and **PHILLIPS**, Circuit Judges.

---

In January 2019, defendant-appellant Demontrae Wilson was convicted of receiving and possessing a stolen firearm, in violation of 18 U.S.C. § 922(j), and of possessing ammunition as a felon, in violation of 18 U.S.C. § 922(g)(1). He was sentenced to ninety-six months' imprisonment. In this appeal, Mr. Wilson raises five distinct challenges to his trial and sentence. Most (but not all) of his challenges relate to the district court's decision to admit into evidence subpoenaed

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

records from two Facebook accounts.

Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we **affirm in part** and **reverse in part**.

## I

On February 6, 2018, thirteen firearms were stolen from the ACME pawnshop in Colorado Springs, Colorado. On the day of the burglary, a Facebook user named "BigTop Cox" posted three photographs of one of the stolen firearms—a Windham Weaponry AR-15—to his Facebook page. "BigTop Cox" also posted photographs of several other guns stolen from the ACME pawnshop on February 6. Later that day, a different Facebook user, "YG Vito Bandolini" sent "BigTop Cox" photographs of the same stolen firearms, with the pawnshop price tags still attached to the rifles.

On March 21, 2018, a Colorado Springs police officer stopped Mr. Wilson's Audi sedan after witnessing a traffic violation. At the time, Mr. Wilson had an outstanding bench warrant. Mr. Wilson was in the front passenger seat, and a large white bandage covered part of his left ear. In the back seats were a Mr. Deshawn Watson, who gave the officer a false name, and a Ms. Laina Curtis. The police officer arrested Mr. Wilson on the bench warrant. The officer thereafter discovered the stolen Windham Weaponry AR-15, loaded, in the back seat of Mr. Wilson's car. The officer found loose rounds of ammunition throughout the vehicle, and a rifle

case for the stolen AR-15 in the trunk.

The police officer also arrested Mr. Watson for giving him a false name. Police later searched Mr. Watson's cell phone and found a photograph that matched the photograph of the stolen Windham Weaponry AR-15 that "BigTop Cox" had posted to Facebook the day of the ACME pawnshop burglary. The police also discovered that the public profile photograph for the Facebook page of "BigTop Cox" was a picture of Mr. Watson.

The Colorado Springs police eventually served a search warrant on Facebook, requesting copies of certain records of posts and communications by Facebook users "YG Vito Bandolini" and "BigTop Cox." Facebook complied with the warrant. It also provided a certificate of authenticity—signed under penalty of perjury by a Facebook custodian of records—that declared that the contents of the subpoenaed records were "made at or near the time the information was transmitted by the Facebook user." Suppl. R. at 39 (Certificate of Authenticity, dated Nov. 20, 2018).

The Facebook records appeared to link Mr. Wilson to the "YG Vito Bandolini" Facebook account. The account's public profile photographs were of Mr. Wilson and his wife. The account's registered email address seemingly mirrored part of Mr. Wilson's first name, and the user's current location was listed as Colorado Springs. The account contained other photographs of Mr. Wilson and

his wife, and communications between "YG Vito Bandolini" and Mr. Wilson's wife. The Facebook records also appeared to explain the large white bandage covering part of Mr. Wilson's ear at the time of his arrest. "YG Vito Bandolini" told one user that he had been "shot in the head," and later sent a photograph of a bullet wound behind the top part of his left ear. *Id.* at 44 (Facebook Business R., generated Apr. 27, 2018).

During their investigation, police also searched an apartment that Ms. Curtis recently vacated. The rug on the bathroom floor of the apartment appeared very similar to the rug in photographs posted to Facebook by "BigTop Cox" of the Windham Weaponry AR-15, among certain other firearms from the ACME pawnshop. In the bathroom medicine cabinet of the apartment, police found two prescription drug bottles with Mr. Wilson's name on them. The police also found ammunition identical to the kind found in Mr. Wilson's vehicle on the day of his arrest.

## II

Mr. Wilson was indicted for (1) receipt and possession of a stolen firearm, in violation of 18 U.S.C. § 922(j); (2) possession of a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1); and (3) possession of ammunition as a felon, also in

4

violation of 18 U.S.C. § 992(g)(1).[1]  The date range for the two firearm-possession charges spanned February 6, 2018 (the date of the pawnshop burglary) to March 21, 2018 (the date of Mr. Wilson's arrest, when police found the stolen AR-15 in his vehicle).

At trial, the government sought to introduce Facebook records from the accounts of "YG Vito Bandolini" and "BigTop Cox."[2]  The government offered the certificates of authenticity from Facebook record custodians to establish the authenticity of the account records.  Mr. Wilson objected.  He argued that the records were not self-authenticating under FED R. EVID. 802–803 and 902, and did not constitute business records.  The government responded that the certificates were offered only to show that the Facebook records were provided in response to the subpoena.  The certificates did not identify the owners of the two accounts. The government therefore acknowledged that the certificates alone were not sufficient to show who posted the photographs and messages, and that it would need to present more evidence to that end for the records to be admitted into

[1]      After an objection by Mr. Wilson, the government elected to proceed on the ammunition-related felon-in-possession charge based solely on the ammunition found in Mr. Wilson's vehicle on the date of his arrest—and not, also, on the ammunition found in Ms. Curtis's apartment.

[2]      Earlier in the pre-trial proceedings, the district court excluded three photographs of Mr. Wilson holding a firearm *other* than the stolen Windham Weaponry AR-15 on the grounds that the photographs constituted improper evidence under FED. R. EVID. 404(b).

5

evidence.

The district court thus admitted the certificates solely "to establish that the records are authentic Facebook account records." R., Vol. VI, at 454 (Trial Tr., dated Jan. 29, 2019). And the court made it clear that the government would need to present further foundation before it would admit the records themselves. The government later successfully did so. The district court found that the government had provided a sufficient basis for the jury to infer that Mr. Wilson was "YG Vito Bandolini" for several reasons: (1) the account's registered email address, montrae47w@yahoo.com, appeared to be derived from Mr. Wilson's first name, Demontrae; (2) the account listed Colorado Springs, Colorado, as the user's current location (a location associated with Mr. Wilson); and (3) the account contained multiple pictures of Mr. Wilson, including the public profile photograph. The court further explained that what made this matter "an easy issue" was that "YG Vito Bandolini" had clearly suffered the same unique gunshot to the head as Mr. Wilson. *Id.* at 452. The court eventually admitted the Facebook records for "YG Vito Bandolini" and "BigTop Cox."[3]

---

[3] The district court did not similarly explain its decision to admit the photographs from the "BigTop Cox" Facebook account. Yet, prior to its decision, the court had heard that the account's public profile photograph was of Mr. Watson, that Mr. Watson had on his cell phone one of the photographs of a stolen firearm that "BigTop Cox" had posted to Facebook, and that the firearms in the "BigTop Cox" Facebook photos were the ones stolen from the pawnshop.

6

Importantly, Mr. Wilson had also moved to exclude certain firearms photographs both under FED. R. EVID. 404(b) and as hearsay. But the district court overruled Mr. Wilson's Rule 404(b) objection. It admitted the contested photographs "to show access to the weapons, in a timeframe that suggests knowledge of their theft." *Id.* at 546. The court likewise overruled the hearsay objection to the photographs, concluding that they did not make any apparent assertion.

In its final jury instructions, the district court specified that the same stolen firearm—the Windham Weaponry AR-15—was the subject of counts one and two against Mr. Wilson, receipt and possession of a stolen firearm and possession of a firearm as a felon. The court also specified that the ammunition recovered from Mr. Wilson's car was the subject of count three, possession of ammunition as a felon. For purposes of the two felon-in-possession charges, the parties stipulated that Mr. Wilson previously had been convicted of a crime punishable by a term of imprisonment exceeding one year. The jury was not instructed that to convict Mr. Wilson of the two felon-in-possession charges they had to find that, at the time of the offenses, Mr. Wilson knew that he had previously been convicted of a felony (i.e., a crime punishable by more than one year in prison). But Mr. Wilson did not object at trial to this omission in the instructions.

7

The jury convicted Mr. Wilson of receiving and possessing a stolen firearm and of possessing ammunition as a felon. However, the jury acquitted Mr. Wilson of possessing a firearm as a felon.

The Presentence Investigation Report ("PSR") found that Mr. Wilson had two prior adult convictions for a "crime of violence" within the meaning of the U.S. Sentencing Guidelines Manual ("U.S.S.G." or "Guidelines"),[4] including a conviction under Colorado's law of third-degree assault. Mr. Wilson timely objected to the PSR's conclusion that his third-degree assault conviction was a "crime of violence" under the Guidelines. He argued that we previously had rejected such a conclusion in *United States v. Perez-Vargas*, 414 F.3d 1282 (10th Cir. 2005). Mr. Wilson further insisted that Colorado's third-degree assault statute does not require violent force.

The district court rejected Mr. Wilson's objection. It concluded that the PSR correctly determined that Mr. Wilson's total offense level was twenty-eight and his criminal history category was V, resulting in a Guidelines range of 130 to 162 months' imprisonment. Yet, the court granted Mr. Wilson's motion to depart downward from the Guidelines range. Tacitly referencing Guidelines § 4A1.3(b),

---

[4] The U.S. Probation Office used the 2018 edition of the Guidelines in calculating Mr. Wilson's advisory Guidelines sentence. Mr. Wilson does not object to this choice on appeal. Therefore, we also rely on this edition of the Guidelines, as needed, in resolving the issues in this appeal.

the court determined that criminal history category V substantially overstated the seriousness of Mr. Wilson's criminal history and reasoned that a criminal history category of IV "makes more sense." R., Vol VII, at 49 (Tr. Sentencing Hr'g, dated May 29, 2019). The court adjusted Mr. Wilson's Guidelines range down to 110 to 137 months' imprisonment, and then ultimately sentenced him to ninety-six months in prison. This timely appeal followed.

### III

Mr. Wilson raises five arguments on appeal. First, he insists that the district court abused its discretion by admitting into evidence unauthenticated Facebook posts. Second, he contends that the court violated FED. R. EVID. 404(b) and the rule against hearsay by admitting into evidence the Facebook photographs of firearms. Third, he argues that the court erred in failing to raise *sua sponte* a duplicity problem allegedly posed by the Facebook evidence in count one—the receipt and possession of a stolen firearm. Fourth, he maintains that the court erred in failing to instruct the jury that, in order to find him guilty of the charged felon-in-possession offenses, they had to find that, at the time of the offenses, he knew that he occupied the status of felon—that is, he knew that he had been convicted of a crime punishable by more than one year in prison. Finally, he argues that the court erred in finding that Mr. Wilson's third-degree-assault conviction under Colorado law was a "crime of violence" under the Guidelines. For the reasons set

forth below, we reject all of Mr. Wilson's contentions of error, except for his jury-instruction challenge to the felon-in-possession instructions. As to that instructional challenge, we conclude that Mr. Wilson has established, under the plain-error rubric, that he is entitled to relief. Accordingly, we affirm in part and reverse in part.

## A

Mr. Wilson first argues that the district court erred in admitting into evidence Facebook account materials from users "YG Vito Bandolini" and "BigTop Cox." According to Mr. Wilson, the court made two errors: it wrongly treated the Facebook materials as "self-authenticating" because of the certificates of authenticity that Facebook provided, and it failed to require "external circumstantial evidence" to establish that Mr. Wilson was the user of the "YG Vito Bandolini" account. Aplt.'s Opening Br. at 15, 21. Because we review this alleged error for abuse of discretion, we will only overturn the district court's decision if "we are firmly convinced that the district court 'made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" *United States v. Magleby*, 241 F.3d 1306, 1315 (10th Cir. 2001) (quoting *Moothard v. Bell*, 21 F.3d 1499, 1504 (10th Cir. 1994)).

Mr. Wilson has failed to show that the district court abused its discretion by admitting the Facebook evidence. His argument rests on an erroneous view of the

10

trial record. The district court never held that Facebook's certificates of authenticity somehow self-authenticated the contents of the Facebook users' posts—much less established the identities of the users themselves. Instead, the court held that the certificates of authenticity merely "establish[ed] that the records are authentic Facebook account records, that's all." R., Vol. VI, at 454. It is precisely for this reason that the court ruled that further foundation would be necessary before it would admit any messages or photographs from the accounts. With respect to the materials from the "YG Vito Bandolini" account, the court expressly told the government that it had to provide sufficient evidence to establish that the account was Mr. Wilson's.

Mr. Wilson also wrongly suggests that the district court relied solely on the contents of the Facebook materials—and not external circumstantial evidence—to authenticate the materials and establish their relevance. The court did not admit the Facebook posts from "BigTop Cox" into evidence until the manager of the ACME pawnshop verified that the firearms depicted in the user's photographs were the same ones stolen from the pawnshop. And the court similarly relied on the fact that Mr. Wilson and "YG Vito Bandolini" were both "shot in the head" and had the same unique bullet wound when it admitted into evidence the "YG Vito Bandolini" account materials. *Id.* at 452. It is therefore wrong to suggest that the court failed to rely on any external evidence to authenticate and admit the Facebook evidence.

11

In sum, Mr. Wilson's first challenge fails because he incorrectly imputes to the district court errors that the record does not reveal.

**B**

Mr. Wilson next argues that the district court violated FED. R. EVID. 404(b) and the rule against hearsay by admitting into evidence the Facebook photographs of the stolen firearms. He insists that the photographs amounted to improper Rule 404(b) evidence because the government "made no record as to [the photographs'] proper purpose." Aplt.'s Opening Br. at 23. But here, too, Mr. Wilson adopts a mistaken view of the record.

To prove the § 922(j) charge, the government had to show that Mr. Wilson received and possessed a stolen firearm "knowing or having reasonable cause to believe" that the firearm was stolen. 18 U.S.C. § 922(j). The district court thus appropriately held that "an unmistakable purpose" of the government's use of the firearms photographs was "to show not only that the guns were, in fact, stolen, but that [Mr. Wilson] knew or had reasonable cause to believe that they were stolen." R., Vol. VI, at 90 (Tr. Hr'g, dated Jan. 10, 2019). Even assuming that the admissibility of the photographs was subject to the strictures of Rule 404(b),[5] the

_____

[5] The government has argued alternatively that the photographs were "intrinsic to the charged crime" and, accordingly, that their admission was "not subject to Rule 404(b)." Aplee.'s Resp. Br. at 28; *see also United States v. Kupfer*, 797 F.3d 1233, 1238 (10th Cir. 2015) (noting that "[w]hen we apply Rule 404(b), we distinguish between evidence that is extrinsic or intrinsic to the charged crime"

12

district court did not abuse its discretion in finding that they were admissible to prove knowledge—a permissible use under Rule 404(b). *See, e.g.*, *United States v. Watson*, 766 F.3d 1219, 1237 (10th Cir. 2014) (noting that the evidence was admitted for "proper purposes under Rule 404(b)," *inter alia*, "to prove [the defendant's] knowledge and intent to join the charged conspiracy").

Mr. Wilson's contention that the firearms photographs amounted to hearsay fares no better. Mr. Wilson insists that because some of the firearms contained price tags, those tags allegedly "impl[ied] their negotiation and sale non-verbally." Aplt.'s Opening Br. at 27. Yet, Mr. Wilson does not explain how these largely illegible tags could be an assertion of an offer to sell; nor does he show, more generally, that the photographs of the tags were introduced by the government and admitted by the court for the truth of the matter asserted—that is, for the truth of such an offer to sell. *See, e.g.*, *United States v. Ibarra-Diaz*, 805 F.3d 908, 924 (10th Cir. 2015) ("Because it was not offered for the truth of the matter asserted, the testimony did not constitute hearsay . . . ."). Indeed, only one price tag was clearly legible. And the record indicates that this photograph with the legible price tag was admitted for a non-hearsay purpose—namely, to show that the tag was

_____

and that Rule 404(b) "does not cover evidence that is considered" the latter). Given our manner of resolving Mr. Wilson's challenge to the admission of the photographs, however, we have no need to consider the merits of this alternative argument.

13

unique to the pawn shop from which the firearms were stolen. Accordingly, there is no sign that this, or the other photographs of the tags, were admitted for a hearsay purpose; thus, they were not hearsay.

## C

Mr. Wilson further maintains that the district court erred in failing to raise *sua sponte* an alleged duplicity problem that the Facebook evidence created in the § 922(j) charge—receipt and possession of a stolen firearm. He argues that different members of the jury could have found that he received and possessed the stolen Windham Weaponry AR-15 at different, non-overlapping times.

However, Mr. Wilson has waived this issue by failing to raise it in a pretrial motion under FED. R. CRIM. P. 12(b)(3)(B)(i) and by failing to argue on appeal that he had good cause for not raising it in a timely manner. *See United States v. Bowline*, 917 F.3d 1227, 1237 (10th Cir. 2019) (holding that "we will not review an untimely Rule 12 argument absent good cause"); FED. R. CRIM. P. 12(b)(3)(B)(i) (providing that "duplicity," or "joining two or more offenses in the same count," is a Rule 12 argument). Mr. Wilson's failure to argue good cause in either his opening brief or reply brief is a fatal omission of this argument on appeal.

## D

Mr. Wilson argues that the jury was "improperly instructed" on the elements of the felon-in-possession offense "in light" of the Supreme Court's decision in

14

*Rehaif v. United States*, --- U.S. ----, 139 S. Ct. 2191 (2019), and his felon-in-possession conviction must therefore be overturned. Aplt.'s Opening Br. at 32 (bold-face font and capitals omitted). Approximately six months after the jury found Mr. Wilson guilty of his felon-in-possession offense (involving possession of ammunition), the Court held in *Rehaif* that, to convict a defendant under 18 U.S.C. § 922(g), the government "must show that the defendant knew he possessed a firearm and also that he knew he had the relevant [prohibited] status when he possessed it." 139 S. Ct. at 2194; *see United States v. Benton*, 988 F.3d 1231, 1236–39 (10th Cir. 2021) (examining the contours of *Rehaif*'s holding).

As applied here, this means that the government was required to prove not only that Mr. Wilson was in fact a convicted felon at the time that he possessed the ammunition, but also that he knew that he was a felon—that is, he knew that he had been convicted of a crime punishable by a prison term exceeding one year. But, as Mr. Wilson points out, the district court's instructions to the jury concerning the felon-in-possession offense elided the knowledge-of-status element; in other words, they did not require the jury to find that Mr. Wilson knew of his felon status at the time he possessed the ammunition. Given the timing of *Rehaif*, the district court's failure to instruct regarding the knowledge-of-status element is "understandable," but nevertheless we recognize that the felon-in-possession instructions were legally erroneous. *United States v. Tignor*, 981 F.3d 826, 828 (10th Cir. 2020).

That said, we agree with the government's conclusion that Mr. Wilson forfeited (that is, never raised) this instructional objection before the district court. Nor does Mr. Wilson acknowledge this forfeiture in his opening brief. Ordinarily, as a consequence of such failings, we would not consider Mr. Wilson's instructional objection at all—deeming it "effectively waived." *Havens v. Colo. Dep't of Corr.*, 897 F.3d 1250, 1259 (10th Cir. 2018); *see United States v. Leffler,* 942 F.3d 1192, 1196 (10th Cir. 2019) ("When an appellant fails to preserve an issue and also fails to make a plain-error argument on appeal, we ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise."). However, in his reply brief, Mr. Wilson does not dispute his forfeiture; instead, he seeks to "run the gauntlet created by our rigorous plain-error standard of review." *United States v. McGehee*, 672 F.3d 860, 876 (10th Cir. 2012).

In such circumstances, we have exercised our discretion to review forfeited arguments—albeit only for plain error. *See United States v. Zander*, 794 F.3d 1220, 1232 n.5 (10th Cir. 2015) (concluding that "Defendant adequately addressed the issue of plain error review in his reply to the government's brief, after arguing in his opening brief that his objections below were sufficiently raised to be preserved for review on appeal"); *see also Tignor*, 981 F.3d at 829 (addressing the defendant's *Rehaif*-based plain-error argument that was "newly presented in his

16

reply brief"); *United States v. MacKay*, 715 F.3d 807, 831 n.17 (10th Cir. 2013) (noting that "we do not discount the possibility that we may consider a plain error argument made for the first time in an appellant's reply brief"). And we do so here.

To satisfy the rigorous plain-error standard, Mr. Wilson must show "(1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights. If he satisfies these criteria, this Court may exercise discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007) (quoting *United States v. Kimler*, 335 F.3d 1132, 1141 (10th Cir. 2003)). Importantly, "[w]e apply plain error 'less rigidly when reviewing a potential constitutional error,' as is the case here because 'an improper instruction on an element of the offense violates the Sixth Amendment's jury trial guarantee.'" *United States v. Samora*, 954 F.3d 1286, 1293 (10th Cir. 2020) (citation omitted) (first quoting *United States v. James*, 257 F.3d 1173, 1182 (10th Cir. 2001), then quoting *Neder v. United States*, 527 U.S. 1, 12 (1999)); *see also United States v. Dazey*, 403 F.3d 1147, 1174 (10th Cir. 2005).

The government candidly "concedes the first two prongs of plain error." Aplee.'s Resp. Br. at 40. That is, it accepts that the district court's felon-in-possession instructions are clearly or obviously erroneous under current law

17

because they omit the knowledge-of-status element. *See, e.g.*, *United States v. Cordery*, 656 F.3d 1103, 1107 (10th Cir. 2011) (noting that "plain error is measured at the time of appeal"). But the government insists that Mr. Wilson cannot satisfy the remainder of the plain-error factors, and, consequently, that he is not entitled to relief. Having carefully considered the matter, we are constrained to disagree. We turn now to consider those plain-error factors.

Recall that under the third prong of the plain-error standard, Mr. Wilson "must show [that] the error affected his substantial rights." *Samora*, 954 F.3d at 1293. More specifically, he must demonstrate that there is a "'reasonable probability that, but for the error,' the outcome of the proceeding[s] would have been different." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 76 (2004)); *accord United States v. Gonzalez-Huerta*, 403 F.3d 727, 733 (10th Cir. 2005) (en banc). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Wolfname*, 835 F.3d 1214, 1222 (10th Cir. 2016) (quoting *United States v. Rosales-Miranda*, 755 F.3d 1253, 1258 (10th Cir. 2014)). In conducting this reasonable-probability inquiry—an inquiry focused on the potential that the alleged error prejudiced the defendant, *see Gonzalez-Huerta*, 403 F.3d at 733—the judgment of "the reviewing court" is "informed by the entire record." *Dominguez Benitez*, 542 U.S. at 83; *see United States v. Edgar*, 348 F.3d

18

867, 872 (10th Cir. 2003) ("We may consult the whole record when considering the effect of any error on substantial rights."); *see also United States v. Reed*, 941 F.3d 1018, 1021 (11th Cir. 2019) (considering the entire record in conducting the reasonable-probability plain-error inquiry, where the defendant alleged *Rehaif*-related trial error).[6]

"When a district court gives a legally incorrect jury instruction on the principal elements of the offense or a defense, we often have concluded that the legal error affected the outcome of the trial proceedings." *United States v.*

---

[6] In making their plain-error arguments—under *both* the third and fourth prongs of the plain-error standard—both parties rely on not only the trial record, but also information in the PSR. *See* Aplt.'s Reply Br. at 22; Aplee.'s Resp. Br. at 41–44; *see also* Aplt.'s Opening Br. at 34. We recognize that construing the scope of entire-record review, in the context of a plain-error assessment of *Rehaif* trial error, as review extending beyond the trial record (i.e., the evidence before the jury) to include other reliable record information, such as the PSR, is not a universal practice—at least when considering both the third *and* fourth prongs. *See, e.g.*, *United States v. Maez*, 960 F.3d 949, 960 (7th Cir. 2020) ("The circuits have taken different approaches to the record for plain-error review of *jury verdicts* in light of *Rehaif*."); *see also United States v. Nasir*, 982 F.3d 144, 164–65 (3d Cir. 2020) (en banc) ("[C]ourts of appeals that have considered whether the government's failure to prove the knowledge-of-status element in a 922(g) prosecution is plain error . . . . have reached that result based on their preliminary conclusion that they are permitted to look outside the trial record to find evidence to plug the gap left by the prosecution at trial. The justifications offered for that view are not all of a piece."). However, the Tenth Circuit does not appear to have opined on this matter in controlling precedent. Consequently, we are content for purposes of resolving this case to follow the parties' lead. "[A] future panel may need to resolve whether courts in similar circumstances can look beyond the trial record." *United States v. Arthurs*, 823 F. App'x 692, 696 n.7 (10th Cir. 2020) (unpublished).

19

*Benford*, 875 F.3d 1007, 1017 (10th Cir. 2017) (quoting *United States v. Duran*, 133 F.3d 1324, 1333 (10th Cir. 1998)); *accord Samora*, 954 F.3d at 1293. Indeed, in assessing whether there is a reasonable probability that the legal instructional error affected the outcome in analogous circumstances involving a missing offense element, we have considered whether the evidence concerning the element was strong enough that "a jury would be compelled to find" the missing element satisfied. *Benford*, 875 F.3d at 1018; *see Samora*, 954 F.3d at 1294–95 (highlighting *Benford*'s compelled-to-find language, and concluding that the evidence was "not sufficient to convince us that the jury would have reached the same conclusion if properly instructed" and, consequently, that "the instructional error affected Defendant's substantial rights").

Here, "the comparatively weak[] evidence on [the knowledge-of-status element] undermines our confidence in the outcome," *Benford*, 875 F.3d at 1018, and leaves us unable to conclude that "the jury would have reached the same conclusion if properly instructed," *Samora*, 954 F.3d at 1294. Consequently, we determine that Mr. Wilson has satisfied the third prong of the plain-error test.

Specifically, as most relevant to our disposition, Mr. Wilson highlights in his opening brief that there were facts in the record that called into serious question whether he knew he was a felon at the time of the offense. In this regard, he notes that "[v]irtually all of [his] prior convictions were juvenile adjudications," and his

20

only felony adult conviction "occurred when he was 18 years old and resulted in a sentence to the Youthful Offender Services." Aplt.'s Opening Br. at 34. And, given these circumstances, Mr. Wilson contends that "[t]here is significant reason to believe that [he] might not have interpreted this sentence as one qualifying him a prohibited person." *Id.*

In his reply brief, Mr. Wilson reinforces this argument. He notes that delinquency adjudications in Colorado are not criminal in nature, and that "Mr. Wilson is a young man whose 'criminal' history consists of juvenile adjudications in Colorado." Aplt.'s Reply Br. at 22 (citing *C.B. v. People*, 122 P.3d 1065, 1065–66 (Colo. App. 2005)). As he reasons, "[t]he question is whether Mr. Wilson was aware that his sentence to the youthful offender system when he was 18 years old, was a crime rather than an adjudication," and he concludes that "[t]here is no indication that Mr. Wilson understood this distinction." *Id.*

In substance, we believe that the foregoing arguments from Mr. Wilson are persuasive. And, though vigorously presented, the government's contrary arguments are unavailing. The key facets of the government's position are captured in this passage of its brief:

> The violent nature of Wilson's prior crime, the eight-year sentence he received, the four-year youthful offender system sentence he served, and the advisement that presumably accompanied his guilty plea all leave little doubt that Wilson knew his prior conviction was for "a crime punishable by imprisonment for a term exceeding one year."

21

Aplee.'s Resp. Br. at 42–43 (quoting 18 U.S.C. § 922(g)(1)).

The government suggests that because Mr. Wilson's one adult felony conviction was for a serious violent crime, for which he was sentenced to a lengthy term of imprisonment (i.e., eight years), a reasonable jury would have concluded that Mr. Wilson must have known his status as a convicted felon. The government correctly notes in this regard that the adult felony involved "attempted aggravated robbery with a deadly weapon" and, more specifically, that Mr. Wilson "robbed a 14-year-old boy at gunpoint, pointing his gun at the boy's temple." *Id.* at 41. However, the sad truth is that Mr. Wilson has displayed a proclivity for serious violent conduct, even as a juvenile; his record of juvenile adjudications clearly attests to this. This record includes adjudications for committing at the early age of fifteen offenses involving (1) aggravated robbery with a fake pistol, during which Mr. Wilson purported to brandish a handgun at a store teller, and (2) assault with reckless infliction of injury, during which Mr. Wilson punched, kicked, and stomped the victim on his ribs. Therefore, there is a reasonable probability that a reasonable jury would not find that the violent nature of Mr. Wilson's adult felony offense, standing alone, would have alerted him to the fact that he had entered the criminal big leagues and was now a convicted felon.

Moreover, though Mr. Wilson received a longer sentence of imprisonment for his adult felony offense—eight years—than he had heretofore ever received for

22

juvenile offenses, the picture of the true character of his offense arguably became blurry when that eight-year sentence was suspended and he was allowed to alternatively serve a four-year term in Youthful Offender Services. Mr. Wilson completed that four-year sentence (with credit for 180 days of time served) under the wing of Youthful Offender Services, and apparently never served any of his eight-year prison sentence. This is important and cuts against the idea that Mr. Wilson would have understood from the magnitude of the punishment he received for his offense that he was a convicted felon (i.e., subject to being punished by imprisonment for more than one year).

In roughly analogous circumstances, in holding that the defendant "lacked a plausible argument that he hadn't known that his prior conviction was punishable by more than a year in prison," we stressed that the defendant "actually served roughly two years in prison." *Tignor*, 981 F.3d at 830–31. There, following his "conviction on aggravated assault, [the defendant] was sentenced to 10 years of shock probation." *Id.* at 828. However, "the court later revoked probation and imposed a prison term of 7 years. [The defendant] served about 2 years of that sentence . . . ." *Id.* The defendant—in contending that he lacked knowledge that his conviction was punishable by imprisonment for more than one year (i.e. that he was a felon)—highlighted that his initial sentence was only to shock probation, and the seven-year prison sentence only came after the court revoked his probation.

23

Yet, we rebuffed the suggestion that these circumstances undermined the conclusion that the defendant possessed the requisite knowledge of his prohibited felon status, noting that the defendant "didn't just get his probation revoked; he also spent roughly two years in prison." *Id.* at 830; *see also id.* (noting that the defendant "presumably wouldn't forget that he'd spent well over a year in prison after obtaining the conviction").

The facts here are quite distinguishable—and in ways that suggest that Mr. Wilson's sentence to more than one year of imprisonment for his adult felony conviction would not have brought home to him, in the way that it did the *Tignor* defendant, that he occupied a prohibited status as a convicted felon. Though Mr. Wilson was sentenced to eight years' imprisonment for his adult felony conviction, in virtually the same breath, the court remanded Mr. Wilson to the custody of Youth Offender Services in lieu of that sentence, and Mr. Wilson never left that custody—discharging his obligation on his conviction in a juvenile facility, not an adult prison. Therefore, it cannot be said here, as in *Tignor*, that Mr. Wilson "lacked a plausible argument that he hadn't known that his prior conviction was punishable by more than a year in prison." *Id.* at 831.

In sum, under these unique circumstances, we cannot say that a reasonable "jury would be compelled to find" that Mr. Wilson knew—based on this eight-year sentence—that he was a convicted felon. *Benford*, 875 F.3d at 1018. More to the

24

point, there is a reasonable probability that a reasonable jury would not have found that he knew his felon status based on the unique circumstances of the sentence the court imposed for his adult felony. And the cases that the government has identified do not arise in such unique circumstances. *See* Aplt.'s Reply Br. at 23 (noting that the government's authorities "do not address the juvenile/adult, adjudication/crime distinction").

Moreover, where those cases have held that the defendants have not satisfied their prejudice burden at prong three of the plain-error standard, the defendants actually had served prison terms based on their prior convictions that exceeded one year. *See United States v. Hollingshed*, 940 F.3d 410, 415–16 (8th Cir. 2019) ("[The defendant] pleaded guilty to possession with intent to distribute cocaine in 2001, was sentenced to 78 months' imprisonment, and was imprisoned for about four years before he began his supervised release."), *cert. denied*, --- U.S. ----, 140 S. Ct. 2545 (2020); *United States v. Benamor*, 937 F.3d 1182, 1189 (9th Cir. 2019) ("When Defendant possessed the shotgun, he had been convicted of seven felonies in California state court, including three felonies for which sentences of more than one year in prison were actually imposed on him . . . . Defendant spent more than nine years in prison on his various felony convictions before his arrest for possessing the shotgun."), *cert. denied*, --- U.S. ----, 140 S. Ct. 818 (2020).

And, though further removed from these circumstances than *Tignor*, in

25

finding that a defendant's showing at the third prong of the plain-error standard was insufficient, we also have focused on whether the defendant actually served more than one year in prison. *See United States v. Trujillo*, 960 F.3d 1196, 1208 (10th Cir. 2020) ("Defendant was convicted of six felonies and sentenced to a term of 24 years' imprisonment, with 20 years suspended. Defendant thus served a total of four years in prison for six felony offenses." (citation omitted)).

Lastly, regarding the portion of the government's argument predicated on "the advisement that presumably accompanied his guilty plea," the government highlights that Mr. Wilson's adult conviction stemmed from a guilty plea, and "Colorado law precludes a court from accepting a plea unless the defendant understands the maximum penalty for the offense." Aplee.'s Resp. Br. at 42. Thus, the government suggests that a reasonable jury would have found that it is almost certain that "the state court judge who accepted Wilson's plea told Wilson at the time that his crime was punishable by more than a year in prison," and, consequently, that Mr. Wilson knew that, as a consequence of his plea, he would occupy the status of convicted felon. *Id.* (citing *United States v. Burghardt*, 939 F.3d 397, 404 (1st Cir. 2019), *cert. denied*, --- U.S. ----, 140 S. Ct. 2550 (2020)). We are not persuaded.

To be sure, relying as does the government on the First Circuit's decision in *Burghardt*, we have been open to similar reasoning and, consequently, have

26

considered legally prescribed state court plea practices. *Tignor*, 981 F.3d at 830 (noting that the defendant "pleaded guilty to aggravated assault" and "Texas law required the state court to inform him of the possible sentencing range"). However, in *Tignor*, such state court practices—involving advising the defendant "of the possible sentencing range"—were far from dispositive regarding the defendant's knowledge of his status as a prohibited felon, even though the authorized range was more than one year. *Id.* (noting that the "range was 2 to 20 years' imprisonment"). Arguably, it was considerably more important to our holding in *Tignor*—and, certainly, it was at least equally as important as the state court plea practices—that the defendant had in fact "spent roughly two years in prison." *Id.*; *see also id.* ("*Because* he actually served roughly two years in prison, *he knew* that the prior conviction ultimately led to a prison term of over a year." (emphases added)). In other words, it was the fact of the defendant's actual service of a prison term exceeding one year that we underscored in determining that the defendant "lacked a plausible argument that he hadn't known that his prior conviction was punishable by more than a year in prison." *Id.* at 831. As noted, however, that central fact is missing here: as a function of the court's unique sentence for his adult felony conviction, Mr. Wilson completed a four-year term (with credit for 180 days of time served) under the wing of Youthful Offender Services, and apparently never served any of his eight-year prison sentence in an adult penal institution—let alone

27

serve more than one year in such an institution due to his conviction.

Accordingly, irrespective of whether, pursuant to Colorado law, Mr. Wilson received a proper advisement of the maximum sentence for his adult felony offense—under the unique circumstance here—we do not believe this factor significantly avails the government. Stated otherwise, the legal requirements of Colorado law concerning guilty-plea advisements are not enough—alone or in combination with the other factors the government identifies—to "convince us that the jury would have reached the same conclusion if properly instructed." *Samora*, 954 F.3d at 1294. More fundamentally, Mr. Wilson has satisfied us that there is a reasonable probability that—if the jury had been properly instructed—the result of the proceeding would have been different.

Thus, we conclude that Mr. Wilson satisfies the third prong of the plain-error standard. And, "[w]hile a district court's failure to properly instruct the jury 'won't always satisfy the fourth prong of the plain-error test,' when the evidence of an omitted element is 'neither overwhelming nor uncontroverted,' the fourth prong is met." *Id.* at 1295 (quoting *Wolfname*, 835 F.3d at 1223); *see Benford*, 875 F.3d at 1020 ("We concluded the failure to instruct the jury not only affected [the defendant's] substantial rights, but also affected the fairness, integrity, or public reputation of the judicial proceedings 'because the government's evidence on intent was not overwhelming.'" (quoting *United States v. Simpson*, 845 F.3d 1039,

28

1062–63 (10th Cir. 2017))).  That is the state of the evidence here concerning the omitted knowledge-of-status element: it is not overwhelming.  And, notably, the government relies on "the same reasons," Aplee.'s Resp. Br. at 44, that we have found insufficient as to the third prong of the plain-error standard to support its contention that Mr. Wilson cannot satisfy the fourth prong.  Thus, we conclude that Mr. Wilson has satisfied the fourth prong, too.

In sum, we determine that Mr. Wilson has met the stringent requirements of the plain-error standard and, therefore, he is entitled to relief as to his felon-in-possession conviction.[7]

## E

Finally, Mr. Wilson argues that his prior conviction of third-degree assault under Colorado law was not a "crime of violence" under § 4B1.2(a)(1) of the Guidelines in light of our decision in *United States v. Perez-Vargas*, 414 F.3d 1282 (10th Cir. 2005).  Whether a prior offense is a crime of violence under the Guidelines is a question of law that we ordinarily review de novo. *See United States v. Rivera-Oros*, 590 F.3d 1123, 1125 (10th Cir. 2009).

Mr. Wilson's argument might seem quite promising on its face.  After all, in *Perez-Vargas*, we held that third-degree assault under Colorado law is not a crime

---

[7]    In attacking his felon-in-possession conviction based on *Rehaif* error, Mr. Wilson makes or alludes to a few other lines of argument.  In light of our disposition, we have no need to consider the merits of such arguments.

29

of violence under the Guidelines.  Yet, Mr. Wilson neglects to note that we expressly overruled *Perez-Vargas* in *United States v. Ontiveros*, 875 F.3d 533, 536 (10th Cir. 2017).  In *Ontiveros*, we concluded that *Perez-Vargas* was no longer good law in light of the Supreme Court's decision in *United States v. Castleman*, 572 U.S. 157 (2014), which rejected the argument that "one can cause bodily injury 'without the "use of physical force."'"  *Castleman*, 572 U.S. at 170 (quoting App. to Pet. for Cert. 41a).  In light of *Castleman* and *Ontiveros*, Mr. Wilson simply has not provided us any credible reason to conclude that a person can commit third-degree assault under Colorado law without using physical force.

Relatedly, Mr. Wilson also argues for the first time on appeal that Colorado's third-degree assault crime does not necessarily involve the use of physical force because "[b]odily injury" under the relevant state statute includes "impairment of . . . mental condition."  Colo. Rev. Stat § 18-1-901(3)(c).  Mr. Wilson forfeited this argument before the district court, and because he "did not present this argument to the district court, . . . our review is limited to plain error." *United States v. Garcia–Caraveo*, 586 F.3d 1230, 1232 (10th Cir. 2009).  But Mr. Wilson fails to argue plain error in either his opening or reply briefs.  As noted, ordinarily, this circumstance sounds the death knell for such a forfeited argument. *See, e.g.*, *Leffler,* 942 F.3d at 1196; *see also Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011) ("[T]he failure to argue for plain error and its

application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court.").  We therefore deem this argument effectively waived and do not consider it further.  In sum, Mr. Wilson's crime-of-violence sentencing challenge fails.

## IV

For the foregoing reasons, we **affirm in part** and **reverse in part**.  We reject all of Mr. Wilson's challenges except for his jury-instruction challenge to his felon-in-possession conviction based on *Rehaif*.  More specifically, as to that *Rehaif* instructional challenge, we **reverse** and **remand** the case with instructions to **vacate** the felon-in-possession conviction and conduct further proceedings consistent with this order and judgment.

ENTERED FOR THE COURT


Jerome A. Holmes
Circuit Judge

31